IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-03294-PAB (consolidated with Civil Action Nos. 12-cv-00034-PAB and 12-cv-00388-PAB)

THE TOWN OF SUPERIOR, a Colorado municipality,
CITY of GOLDEN, COLORADO,
WILDEARTH GUARDIANS,
ROCKY MOUNTAIN WILD,

      Plaintiffs,

v.

UNITED STATES FISH AND WILDLIFE SERVICE,
UNITED STATES DEPARTMENT OF THE INTERIOR,
KEN SALAZAR, acting in his official capacity as Secretary of the Interior,
DANIEL M. ASHE, acting in official capacity as Director of the United States Fish and Wildlife Service,
STEVE GUERTIN, acting in his official capacity as Regional Director of the Mountain-Prairie Region of the United States Fish and Wildlife Service,
STEVE BERENDZEN, acting in his official capacity as Rocky Flats National Wildlife Refuge Manager,

      Defendants, and

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF JEFFERSON, COLORADO,
CITY OF ARVADA,
JEFFERSON PARKWAY PUBLIC HIGHWAY AUTHORITY,
NATURAL RESOURCE TRUSTEES OF THE STATE OF COLORADO, and
THE BOARD OF LAND COMMISSIONERS OF THE STATE OF COLORADO,

      Defendant-Intervenors.

---

## ORDER

---

      This matter comes before the Court on plaintiffs' challenges in three

consolidated cases to the final action of the United States Fish and Wildlife Service

("FWS") approving a land exchange affecting the Rocky Flats National Wildlife Refuge

in Colorado.  Plaintiff Town of Superior filed its amended complaint on July 19, 2012

alleging violations of the Administrative Procedure Act ("APA"), the National

Environmental Policy Act ("NEPA"), and the Rocky Flats Act ("RFA").  Docket No. 68 at

18-21.  Plaintiff City of Golden filed its complaint on January 5, 2012 alleging violations

of the APA, NEPA, and the RFA  in addition to a violation of the Endangered Species

Act ("ESA").  12-cv-00034-PAB, Docket No. 1 at 16-20.  Plaintiffs WildEarth Guardians

and Rocky Mountain Wild filed their complaint on February 14, 2012 alleging violations

of the APA, NEPA, and the RFA.  12-cv-00388, Docket No. 1 at 18-23.  The three

cases were consolidated through orders dated January 27, 2012 and May 10, 2012.

*See* Docket Nos. 20 and 38.  The Board of County Commissioners of the County of

Jefferson, the City of Arvada, the Jefferson Parkway Public Highway Authority

("JPPHA"), the Natural Resources Trustees of the State of Colorado, and the State

Board of Land Commissioners have intervened as defendants.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## I.  BACKGROUND

In 1951, the United States government purchased several hundred acres of land

northwest of Denver, Colorado to build the Rocky Flats nuclear weapons plant.  AR

27233.[1]  In 1975, the government purchased a buffer zone of land around the plant,

bringing the total area of the site to approximately 6,200 acres.  *Id*. at n.2.  The plant

was operated by the Department of Energy ("DOE") and its predecessors.  AR 27233.

Weapons production was concentrated in a small area on the property and the buffer

---

[1] The administrative record will be referred to herein as "AR ____."

zone was "left mostly undisturbed."  AR  27239.  However, over the course of forty

years, manufacturing activities, spills, fires, and waste disposal released plutonium and

other radionuclides, which were dispersed by wind and rain into the soil and water

systems in the buffer zone.  AR 27245.

In 1989, the Environmental Protection Agency ("EPA") added Rocky Flats to the

National Priorities List as a Superfund site.  AR 27239; *see* the Comprehensive

Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.

§ 9605(a)(8) (2012).  In 1992, DOE ceased manufacturing weapons at the site.  AR

27240.  For the next two decades, EPA, DOE, and the Colorado Department of Public

Health and Environment ("CDPHE") collaborated on cleanup of the site.  AR 27245-

246, 26940 (1996 Final Rocky Flats Cleanup Agreement).

In 2001, Congress passed the RFA to create the Rocky Flats National Wildlife

Refuge ("the Refuge") out of the Rocky Flats Environmental Technology Site.  Pub. L.

No. 107-107, §§ 3171-82, 115 Stat. 1012 (2001).  As part of the creation of the Refuge,

the RFA provides that, upon receipt of a qualifying application, a strip of land along the

eastern boundary of the Refuge (the "corridor") must be transferred to a Colorado

governmental entity for transportation improvements.  *Id*. at § 3174(e).  In 2006,

Congress amended the RFA to encourage federal acquisition of private mineral rights

on Rocky Flats.  Pub. L. No. 109-163, § 3112, 119 Stat. 3136 (2006).

In 2004, pursuant to the RFA, the FWS issued a Comprehensive Conservation

Plan/Environmental Impact Statement ("CCP/EIS") outlining its plan for managing the

Refuge.  AR 3046; *see* RFA at § 3178.  The CCP/EIS concludes that transferring a

corridor of land for transportation improvements would not significantly impact the

Refuge.  AR 3260-61.

In September 2006, EPA and CDPHE issued a final cleanup decision, recommending continued DOE jurisdiction over approximately 1,300 acres that required further cleanup, but finding the surrounding 4,900 acres to be "acceptable for unrestricted use and unlimited exposure."  AR 2468.  In 2007, EPA removed the buffer zone from the National Priorities List, and DOE transferred jurisdiction over approximately 4,000 acres to DOI to establish the Refuge.  72 Fed. Reg. 29,276; AR 1867-71.

In 2008, the City of Arvada, the City and County of Broomfield, and Jefferson County submitted an application for the transportation corridor to DOE in order to construct part of a thirteen-mile tollway to help complete the beltway around Denver. AR 15782.  While awaiting DOE's reply, they formed the JPPHA  AR 4262.  DOE's reply stated that it had transferred jurisdiction over the corridor to the FWS and no longer had authority to approve the transfer of the corridor.  AR 15794.  Accordingly, JPPHA redirected its application to the Secretary of the Interior.  AR 15784.  In March 2010, the FWS entered into discussions with JPPHA and other local government entities regarding the possible transfer of the corridor pursuant to a land exchange.  AR 15782.

In May 2011, the City of Golden ("Golden") submitted an application for the corridor in order to develop a bikeway.  AR 15742-61.  The FWS evaluated both JPPHA's and Golden's proposals for the corridor pursuant to NEPA and the ESA.  *See* 42 U.S.C. § 4321; 16 U.S.C. § 1531.  In November 2011, the FWS issued a Biological Opinion ("BiOp") concluding that the land exchange proposed by JPPHA was not likely

4

to jeopardize the endangered Preble's Meadow Jumping Mouse (the "Preble's mouse") or its critical habitat.  AR 14497-515.  The FWS did not issue a statement exempting any accidental "take" of the Preble's mouse at the time,[2] but in February 2012 it completed a second BiOp, reaching the same conclusion and issuing a statement regarding the possibility of inadvertent take.  AR 17974-998.  In December 2011, the FWS issued an Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI").  AR 15596, 15024-027.  In its FONSI, FWS selected JPPHA's proposal for implementation.  AR 15024.  This decision was subsequently adopted by the Refuge Manager.  AR 16408-412.

The land exchange agreements were finalized at the end of January 2012.  AR 21018 (email forwarding final escrow agreements), 17900-905.  The agreements specify that JPPHA, the City of Arvada, the Colorado Department of Natural Resources, the City and County of Boulder, and Jefferson County will contribute money toward FWS' purchase of (1) approximately 617 acres of land, known as Section 16, which are adjacent to the Refuge and currently owned by the State Land Board; (2) leases for resource extraction on Section 16; and (3) privately owned mineral rights located elsewhere on Rocky Flats.  AR 17904-05.  In return, the FWS will give JPPHA a quitclaim deed to the transportation corridor.  AR 17904.

Plaintiffs Golden, Town of Superior, WildEarth Guardians, and Rocky Mountain Wild filed this case against the FWS, DOI, and four DOI officials in their official

---

[2] Under the ESA,  the term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

capacities,[3] alleging that the FWS' approval of JPPHA's application and rejection of

Golden's application violated NEPA, the ESA, the RFA, and the National Wildlife

Refuge System Administration Act.  Plaintiffs seek an order holding unlawful and setting

aside the FWS' decision to enter into the land exchange and transfer the corridor to

JPPHA.

## II. DISCUSSION

### A.  Standard of Review

Pursuant to the APA, 5 U.S.C. § 701, the Court must determine whether the

agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  *Id*. at § 706(2)(A).  The scope of this review is narrow.  *See*

*Colo. Wild, Heartwood v. U.S. Forest Serv*., 435 F.3d 1204, 1213 (10th Cir. 2006)

(citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983)).  "An agency's decision is arbitrary and capricious if the agency (1) entirely

failed to consider an important aspect of the problem, (2) offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise, (3)

failed to base its decision on consideration of the relevant factors, or (4) made a clear

error of judgment."  *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d

683, 704 (10th Cir. 2009) (internal citation omitted).  "In addition to requiring a reasoned

basis for agency action, the 'arbitrary or capricious' standard requires an agency's

---

[3] Those officials are Ken Salazar, in his capacity as Secretary of the Interior; Daniel M. Ashe, in his capacity as Director of the FWS; Steve Guertin, in his capacity as Regional Director of the Mountain-Prairie Region of the FWS; and Steve Berendzen, in his capacity as Rocky Flats NWR Refuge Manager.

action to be supported by the facts in the record." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994).  An agency's decision, therefore, is arbitrary if not supported by "substantial evidence." *Id.*  "Evidence is substantial in the APA sense if it is enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact." *Id.* (internal citation omitted).

A presumption of validity attaches to agency action and the burden of proof rests with the appellants who challenge such action. *Citizens' Comm. to Save Our Canyons v. Krueger,* 513 F.3d 1169, 1176 (10th Cir. 2008).  The deference given to agency action is "especially strong where the challenged decisions involve technical or scientific matters within the agency's area of expertise." *Utah Envtl. Cong. v. Dale Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006).

## B.  Rocky Flats National Wildlife Refuge Act

Plaintiffs allege that the FWS lacks statutory authority to transfer the transportation corridor because the RFA vested that power exclusively in DOE and because that authority expired when DOE transferred administrative jurisdiction of the Refuge to DOI.  Docket No. 117 at 1-2.  Plaintiffs further allege that JPPHA's proposal does not meet the RFA's requirements and that the FWS' rejection of Golden's proposal was arbitrary and capricious.  Docket No. 100 at 53-61.

### 1.  Statutory Authority to Transfer the Transportation Corridor

#### a.  Statutory Framework

The RFA has a dual purpose: to create the Refuge and to provide for ongoing cleanup of the site.  *Id*. at § 3172(b).  The balance between these goals is evident in the

provision that, 30 business days after the EPA certifies to the Secretary of Energy and the Secretary of the Interior that cleanup of the site is complete, the Secretary of Energy "shall transfer administrative jurisdiction over the property that is to comprise the refuge to the Secretary of the Interior." *Id*. at § 3175(a)(1), (2).  The RFA specifies that DOE is to retain jurisdiction over only that property used in the continuing environmental cleanup.  *Id*. at § 3175(d).

The RFA provides that, no later than 30 days after transfer of jurisdiction, the Secretary of the Interior must establish a wildlife refuge on the land.  *Id*. at § 3177(b). The Secretary of the Interior is then charged with managing the Refuge in accordance with the RFA's purposes, namely, restoring and preserving native ecosystems; providing habitat for native plants and wildlife; conserving endangered species; and providing opportunities for scientific research, where possible. *Id*. at § 3177(e).  The RFA provides that all "right, title, and interest" in Rocky Flats held or acquired after the RFA's enactment shall be retained by the United States.  *Id*. at § 3174(a).

In addition to its two main purposes, the RFA is also intended to ease pressure on regional transportation facilities by allocating a strip of land at the edge of the Refuge for transportation improvements.  *Id*. at § 3174(e).  This purpose was articulated by one of the bill's sponsors, then-Representative Mark Udall, speaking on the House floor:

> Rocky Flats is located in the midst of a growing area of the Denver metropolitan region.  As this area continues to grow, pressure is being put on the existing transportation facilities just outside the borders of the site.  In addition, the Denver-metropolitan region has been constructing a beltway around the city.  The last segment of this beltway yet to be completed or approved for construction is to be in the northwest section of Denver, the same general areas where Rocky Flats is located.  The communities that surround the site have been considering transportation improvements in this

area for a number of years–including the potential completion of the beltway.

146 CONG. REC. E1560 (daily ed. Sep. 21, 2000) (statement of Rep. Udall).

Representative Udall further stated that the RFA "should allow for possible availability of

some land along Indiana Street" but should not "specifically provide for a more far-

reaching availability of Rocky Flats land for a beltway." *Id*.  The RFA implements the

goal of improving regional transportation by providing for the transfer of the

transportation corridor to a government entity:

> On submission of an application meeting each of the conditions specified
> in paragraph (2), the Secretary,[4] in consultation with the Secretary of the
> Interior, shall make available land along the eastern boundary of Rocky
> Flats for the sole purpose of transportation improvements along Indiana
> Street.

Rocky Flats Act, § 3174(e)(1).  The RFA states that applications may only be accepted

from a county, city, or other political subdivision of Colorado, must document that

improvements will be carried out so as to minimize their adverse effect on the Refuge,

and must show that the proposed improvements are included in the Denver Regional

Transportation Plan.  *Id*. at § 3174(e)(2).  The RFA also requires the Secretary of the

Interior to make recommendations about land that could be made available for

transportation improvements in the context of developing a comprehensive

conservation plan for the Refuge.  *Id*. at § 3178(d)(1).

The RFA states that the transfer of the corridor shall be made "in compliance

with applicable law." *Id*. at § 3174(e)(1)(D).  It also states that DOI "shall manage the

refuge in accordance with applicable law, including . . . the National Wildlife Refuge

---

[4] The RFA defines "Secretary" as the Secretary of Energy. *Id*. at § 3173(9).

System Administration Act" (the "Refuge Act").  *Id.* at § 3177(e)(1).  The Refuge Act states that the FWS must manage refuge land with an eye to the "restoration, preservation, development and management of wildlife and wildlands habitat . . . and for the management of wildlife and wildlands to obtain the maximum benefits from these resources."  50 C.F.R. § 25.11 (2012).  To that end, it generally prohibits the transfer or disposal of lands within the refuge system.  16 U.S.C. § 668dd(a)(5) (2012). It does, however, permit the government to exchange Refuge land for other interests in real property so long as the "values of the properties so exchanged" are "approximately equal" or "equalized by the payment of cash."  *Id.* at § 668dd(b)(3).  The FWS may only enter into an exchange that "provide[s] a benefit to refuge resources managed by the Service."  AR 4807; *see* 16 U.S.C. § 668dd(4).

Although not explicitly mentioned in the RFA, applicable law also includes the Fish and Wildlife Act of 1956, which created the FWS.  16 U.S.C. § 741-754e (2012). The Act authorizes the Secretary of the Interior to "take such steps as may be required for the development, advancement, management, conservation, and protection of fish and wildlife resources including . . . acquisition by purchase or exchange of land and water, or interests therein."  16 U.S.C. § 742f(a)(4).

### b.  Facts Relevant to Transfer Authority

In 2004, the FWS issued its CCP/EIS, intended to "guide management of Refuge operations, habitat restoration and visitor services for the next 15 years."  AR 3062.  The CCP/EIS states that the "Refuge Act's § 3174 prohibits the construction of a public road through the Refuge.  However, the DOE can

make available land along the eastern boundary of the Refuge for the sole purpose of transportation improvements along Indiana Street." AR 3146.

In 2006, EPA, DOE, and CDPHE issued a Corrective Action Report/Record of Decision ("CAD/ROD") certifying that cleanup of Rocky Flats was complete and that the land was available for unrestricted use. *See* AR 2452. In 2007, DOE transferred administrative jurisdiction over the land to DOI, thereby creating the Refuge. AR 1874-86. DOI, through the FWS, has been managing the Refuge since that time. *Id*.

As already noted, in April 2008, the City of Arvada, the City and County of Broomfield, and the County of Jefferson sent an initial request to the Secretary of Energy seeking transfer of the transportation corridor. AR 4347-48. DOE and DOI met to discuss the proposal and determine how to proceed. *See, e.g.*, AR 4363. On July 9, 2008, the Director of DOE's Office of Legacy Management sent these entities a reply which explained that DOE lacked jurisdiction to transfer the corridor:

> [The transportation corridor] was transferred from the Department of Energy (DOE) to the U.S. Fish and Wildlife Service (USFWS) on July 12, 2007. The transfer gave total jurisdiction to the USFWS subject to environmental restrictions that were described in the transfer document and the environmental covenants in existence at the time. DOE therefore has no authority or jurisdiction regarding the 300 foot strip of land on the eastern side of the Rocky Flats Wildlife Refuge except for any appropriate environmental restrictions discussed in the aforementioned transfer document. The USFWS is the appropriate federal entity with jurisdiction to work any transfers provided for in the 2001 Rocky Flats Wildlife Refuge Act.

AR 15794. The local government entities redirected their inquiry to the FWS. *See* AR 15975-976.

The FWS considered the question of transfer authority before responding to the local governments' application.  An April 2009 FWS memorandum to the Assistant Secretary of DOI queries "[w]hether or not the Act authorizes the Department of Interior (DOI), as opposed to the Department of Energy (DOE), to sell or transfer the right of way."  AR 4586.  It goes on to ask "whether or not DOI can transfer the 300-foot strip of land back to DOE, and if so by what authority.  The Act contemplated a transfer from DOE, which may have broader authorities to transfer the property to JPPHA for transportation purposes if DOI could return it to DOE."  *Id.*  It concludes by stating that the FWS met with representatives from the DOI's Solicitor's Office for the Rocky Mountain Region to draft a reply to JPPHA's application.  *Id.*  The FWS responded to the applicants, explaining that it has authority to transfer the corridor pursuant to both the Refuge Act and the Fish and Wildlife Act.  AR 4805-08, 15603; *see* 16 U.S.C. § 668dd(b)(3); 16 U.S.C. § 742f(a)(4).

In 2011, the FWS issued an Environmental Assessment ("EA") of the proposed land exchange.  AR 15587.  The EA lists alternatives to the land exchange that the FWS initially considered but eliminated from further analysis, including the option to return management of the transportation corridor to DOE.  AR 15613.  The EA explains the FWS' reason for rejecting this alternative:

> The Rocky Flats Act required the Secretary of Energy to be responsible for disposal of the transportation corridor.  The transportation corridor was contemplated in the Corrective Action Decision/Record of Decision for the Rocky Flats Plant Peripheral Operable Unit and Central Operable Unit, and lands were transferred to the Service in 2007 (DOE 2006).  This alternative would require that management authority over lands be transferred back to DOE.

12

> Transfer of management authority from the Service to DOE is not in
> the interest of any party and would result in increased overall costs.

AR 15613.  Although DOE disclaimed jurisdiction over the transfer, it did consult with

the FWS prior to the acceptance of JPPHA's application, providing comments to the

draft EA and explicitly articulating its approval of the proposed land exchange.  AR

15555 (FWS email memorializing conference call with DOE regarding draft EA and

stating that "DOE will not oppose the EA proposed action, nor the response to

comments. . . . Therefore, we believe that there are no DOE concerns that would

preclude a FONSI determination.").  In December 2011, the FWS approved JPPHA's

application for the corridor and the related land exchange.  AR 15024.

### c.  Discussion

Plaintiff Town of Superior argues that the RFA authorizes only DOE to transfer

the corridor, and that, while DOE must seek the FWS' advice, it cannot empower the

FWS to make the final decision.  Docket No. 118 at 4-5.  It also argues that the record

shows the FWS initially interpreted the statute as permitting only DOE to transfer the

corridor.  *Id*. at 8-10.  Plaintiffs WildEarth Guardians and Rocky Mountain Wild argue

that all authority to transfer the corridor expired once the FWS assumed administration

of the Refuge.  Docket No. 117.  They point out that the RFA imposes certain

obligations jointly on DOE and DOI, but expressly limits the duty to transfer the corridor

to DOE.  Docket No. 117 at 2; *compare* Rocky Flats Act, § 3174(c) ("Neither the

Secretary nor the Secretary of the Interior shall allow the annexation of land within the

refuge by any unit of local government.") *with* § 3174(e)(1)(A) ("the Secretary, in

consultation with the Secretary of the Interior, shall make available land").  They further

assert that the expiration of transfer authority is consistent with the goal of preserving Refuge land.  Docket No. 117 at 3; Rocky Flats Act, § 3172(b)(1).

Defendants argue that the statute's transfer or "administrative jurisdiction" over the Refuge land to DOI included the power to dispose of the transportation corridor. Docket No. 116 at 2; Rocky Flats Act, § 3175(a)(1).  Accordingly, defendants read § 3175(a) as terminating DOE's authority under § 3174(e)(2)(A) once the transfer of jurisdiction was complete.  Docket No. 116 at 5.  Defendants further assert that the list of exceptions to DOI's administrative jurisdiction is exclusive, confining DOE's authority to sites involved in ongoing environmental cleanup.  Docket No. 116 at 4-5; *see* Rocky Flats Act, § 3176.  DOE concurs in this interpretation, as it stated in its July 2008 letter disclaiming authority to sell or exchange the corridor: "[t]he transfer gave total jurisdiction to the USFWS subject to environmental restrictions that were described in the transfer document . . . ."  AR 15794.  In addition, defendants argue that the RFA does not abrogate DOI's powers under the Refuge Act, which authorizes it to enter into land exchanges that benefit refuge property.  Docket No. 116 at 2-5; *see* 16 U.S.C. § 668dd(b)(3).

In construing a statute, courts must condition their reading of each word or phrase "upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006).  The courts' purpose in this task is to "give effect to the intent of Congress."  *Robbins v. Chronister*, 402 F.3d 1047, 1050 (10th Cir. 2005) (internal citation omitted).  To that end, "interpretations of a statute which would produce absurd results are to be avoided if alternative

14

interpretations consistent with the legislative purpose are available." *Id*. (citing *Griffin*

*v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)).

 As stated above, the purpose of the RFA is two-fold: to create a wildlife refuge

at Rocky Flats and to provide for ongoing cleanup of the site. Rocky Flats Act,

§ 3172(b). The legislative history and the inclusion of § 3174 indicates that the RFA

has an additional purpose, which is to relieve the "pressure [] being put on the existing

transportation facilities just outside the borders of the site." 146 CONG. REC. E1560

(daily ed. Sep. 21, 2000) (statement of Rep. Udall). The effort to balance these goals

is evident in the design of the RFA, which grants DOI administrative jurisdiction over all

Refuge land while carving out an exception solely for property involved in

environmental cleanup. *Compare* Rocky Flats Act, § 3175 *with* § 3176. Accordingly,

the RFA ensures that, subsequent to transfer, DOE has no remaining responsibilities

on Refuge land, save for those related to cleanup. *See id*. at §§ 3175(d), 3176. Given

"the whole statutory text" and "considering the purpose and context of the statute,"

Congressional intent would be stymied by a reading that prevented the FWS from

exercising jurisdiction over the transportation corridor and that required DOE to take

charge of a decision with a much greater impact on Refuge management than on the

cleanup process.[5]  *See Dolan*, 546 U.S. at 486; *Robbins v. Chronister*, 402 F.3d at

---

 [5] Plaintiff Town of Superior argues that the "agencies knew that the Transportation Corridor could only be transferred by DOE." Docket No. 118 at 8. In addition to the FWS' statement in the 2004 CCP/EIS that DOE was responsible for transferring the corridor, AR 3260, Town of Superior cites the April 2009 FWS memorandum raising the question of transfer authority. AR 4585-86. These citations are unpersuasive as they evidence only that authority over the corridor is a complex legal issue whose resolution required consideration.

1050.

Furthermore, the reading advanced by plaintiffs WildEarth Guardians and Rocky Mountain Wild is not tenable as it leads to an absurd result. *See Robbins v. Chronister*, 402 F.3d at 1050. Nowhere does the RFA state that transfer authority expires, and reading such a limitation into § 3174 would frustrate Congressional intent to improve regional transportation facilities. *See* 146 CONG. REC. E1560 (daily ed. Sep. 21, 2000) (Rep. Udall). WildEarth Guardians and Rocky Mountain Wild do not explain why the RFA's purpose is served by ensuring that the conveyance would "occur, if at all, before Rocky Flats became a National Wildlife Refuge." Docket No. 117 at 3 (emphasis in original). Nor do they explain why Congress would expect local governments to invest time and resources in acquiring land not yet certified as safe for use. *See* Rocky Flats Act § 3175(a).

In sum, the FWS acted in accordance with the RFA in approving the land exchange.[6]

### 2. *Mitigation Measures*

Plaintiffs argue that JPPHA's application does not meet the conditions of the RFA because it does not include sufficient "documentation demonstrating that the transportation improvements for which the land is to be made available . . . are carried out so as to minimize adverse effects on the management of Rocky Flats as a wildlife refuge . . . ." Rocky Flats Act, § 3174(e)(2)(B)(i); Docket No. 100 at 53-55.

JPPHA's August 11, 2008 application for the corridor cites two sources to

---

[6] In light of this conclusion, the Court need not address the FWS' conclusion that it had authority under the Refuge Act to enter into a land exchange. *See* AR 4805.

document its compliance with the minimization requirement.  AR 4386.  First, it references the finding in the FWS' 2004 CCP/EIS that "transfer of a corridor up to 300 feet wide would not adversely affect the management of the refuge."  *Id*.; AR 3260. Second, it cites CDOT's Northwest Corridor Transportation and Environmental Planning Study.  AR 1553.  The CDOT study considers a number of possible improvements and recommends a plan that includes a tollway alignment along the eastern boundary of the Refuge because that plan would balance "future transportation needs (2030 horizons) with community and environmental impacts better than the other alternatives considered."  AR 1479, 1554.

On April 16, 2009, JPPHA adopted a resolution that lists the mitigation measures contained in the 2004 CCP/EIS, declares that these measures are acceptable to JPPHA, recognizes that these measures will be "required of those designing, constructing, maintaining, and operating" the parkway, resolves that JPPHA is "capable of and willing to implement each of the strategies," and further resolves that JPPHA will negotiate a memorandum of understanding with the FWS to "memorialize" its "commitment to accomplish the desired impact minimization and mitigation."  AR 14537 (listing mitigation measures including "best management practices for water quality," "best management practices for noxious weed control," "below-grade small animal crossings and large animal preventative fencing," and "noise-reducing and light-reducing techniques").

On January 26, 2010, JPPHA submitted a proposal to the FWS for direct sale of the corridor, citing the 2004 CCP/EIS and the Board resolution as evidence of its compliance with the mitigation requirement.  AR 5105-6.  A November 2011 FWS

17

email states that JPPHA could satisfy the minimization requirement by submitting a letter "explicitly stating their commitment to follow the recommended measures from the transportation study." AR 14528.

According to Golden's reading, the RFA's minimization requirement comprises not only a procedural but also a substantive element, obligating the FWS to "choose the proposal with the fewest adverse impacts to the Refuge." Docket No. 93 at 46. Golden argues that this reading is supported by the statute as a whole, which instructs the FWS to manage the Refuge for preservation of wildlife and plant communities. *Id*. at 48-49. It argues that JPPHA's documentation is insufficient because it "provides only general assurances about complying with generic mitigation measures." *Id*. at 48. It further argues that the FWS's analysis of the proposed parkway was insufficient to understand its impacts on the Refuge and how they may be minimized. *Id*.

The FWS interprets the phrase "are carried out so as to minimize adverse effects" to mean that an applicant must indicate that it will undertake steps, in the course of constructing transportation improvements, to ensure that the effects of those improvements are minimized with respect to that particular project. In other words, the FWS understands this to be a strictly procedural provision, requiring only that an "applicant submit . . . information on the steps they will take to minimize the effects of their actions" and not a "comparison of how minimal the minimized impacts are among competing applications." AR 15977.

Under *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984), analysis of an agency's interpretation of a statute begins by determining whether Congress has spoken to the precise question at issue. If Congress has not,

the court must consider whether the agency's construction is permissible. *Id*. A permissible construction is not necessarily the one the court itself would have chosen had it the authority to do so. *Id*. at 843.

In assessing whether to accord an agency *Chevron* deference, courts consider the "degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001). Decisions made pursuant to notice-and-comment rule-making or adjudication tend to receive substantial deference, although deference may be accorded even when "no such administrative formality was required and none was afforded." *Id*. at 231. On the other end of the spectrum, decisions announced in opinion letters, policy statements, agency manuals, and enforcement guidelines generally do not receive *Chevron* deference. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). Where *Chevron* deference is not warranted, courts weigh an agency's decision according to the "thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

The RFA does not use any comparative or superlative language stating that the FWS is bound to select the application that will have the least impact. Instead, the phrase "carried out so as to minimize" indicates that applicants need only document how they will minimize the effects of their project to the extent possible for that particular project. *See* Rocky Flats Act, § 3174(e)(2)(B)(i). Moreover, Golden does not

19

explain how applicants are to acquire the information necessary to show that their project will have less of an impact than other proposed projects.

The Court finds that the RFA's mandate to the FWS to document that improvements will be "carried out so as to minimize adverse effects on the management of Rocky Flats as a wildlife refuge" is ambiguous in that it is susceptible to multiple interpretations regarding the meaning of "minimize" and regarding the volume and nature of documentation necessary. *See Chevron*, 467 U.S. at 842-43. The FWS' resolution of this ambiguity is entitled to *Chevron* deference because the FWS is charged with implementing the RFA, the decision to approve JPPHA's application implicated the FWS' Refuge-management expertise, and the FWS engaged in notice-and-comment procedures before approving the land exchange. *See Mead*, 533 U.S. at 228.

Granting the FWS the appropriate deference, the Court finds that its interpretation of the RFA in regard to the phrase "carried out so as to minimize" is a permissible one. JPPHA's documentation complied with the FWS' interpretation of the requirement. By recognizing that construction of the parkway will require minimization measures, and resolving to work with the FWS to develop and implement those measures already identified in the CCP/EIS, JPPHA demonstrated that it will carry out construction of the proposed parkway so as to minimize the effects of that particular project on the Refuge. *See* AR 14537. The Court affirms the FWS' determination that the statute requires nothing more.

### 3.  *Golden's Application*

Golden argues that the FWS' denial of its application was arbitrary and capricious in part because the proposed bikeway was included in the "regional transportation plan of the metropolitan planning organization designated for the Denver metropolitan area" under the meaning of the RFA.[7]  Rocky Flats Act, § 3174(e)(2)(B)(ii); Docket No. 93 at 50-51.  Defendants counter that Golden's proposal did not meet the RFA's requirements because it was not included in the fiscally constrained Regional Transportation Plan.  Docket No. 95 at 41-43.

The RFA states that applications for the transportation corridor are only eligible if they "include[] documentation demonstrating that the transportation improvements for which the land is to be made available. . . are included in the regional transportation plan of the metropolitan planning organization designated for the Denver metropolitan area under section 5303 of title 49."  Rocky Flats Act, § 3174(e)(2)(B)(ii).

Metropolitan transportation planning is intended to assist localities develop public transportation systems that will foster "desirable urban development" and help meet the transportation needs of the elderly, people with disabilities, and low-income individuals, while minimizing fuel consumption and air pollution.  49 U.S.C. § 5301(f); 23 U.S.C. § 134(a)(1).  Accordingly, metropolitan planning organizations must periodically issue long-range regional transportation plans.  49 U.S.C. § 5303(i)(2).  A

---

[7] Golden asserts that the FWS' denial was arbitrary and capricious on other grounds, as well; however, as the Court finds that exclusion from the Regional Transportation Plan was a sufficient reason for the FWS to reject Golden's application, there is no need to consider plaintiffs' additional arguments.  *See* Docket No. 93 at 50-53.

regional transportation plan must contain a financial plan that "demonstrates how the adopted transportation plan can be implemented, indicates resources from public and private sources that are reasonably expected to be made available to carry out the plan, and recommends any additional financing strategies for needed projects and programs."  *Id.* at § 5303(i)(2)(C).  The "financial plan" may contain "for illustrative purposes, additional projects that would be included in the adopted transportation plan if reasonable additional resources beyond those identified in the financial plan were available."  *Id.*  However, transportation plans must be "fiscally constrained" in order to comply with the Clean Air Act.  40 C.F.R. § 93.108.  A fiscally constrained plan is one that "includes sufficient financial information for demonstrating that projects" in the plan can be "implemented using committed, available, or reasonably available revenue sources."  23 C.F.R. § 450.104.  In addition, transportation plans "shall" include "pedestrian walkway and bicycle transportation facilities."  23 C.F.R. § 450.322.

On September 2, 2008, Golden sent a letter to the FWS arguing that JPPHA was ineligible for the transportation corridor because the proposed parkway, while included in the 2035 Metro Vision Regional Roadway System issued by the Denver Regional Council of Governments ("DRCOG"), was not listed in the fiscally constrained 2035 Regional Transportation Plan.  AR 4436.  Golden argued that the Metro Vision plan was "simply a depiction of DRCOG's unconstrained transportation vision and goals; *it is not the fiscally constrained regional transportation plan required by . . . 49 U.S.C. § 5303.*"  AR 4436 (emphasis in original).  On June 8, 2009, Golden sent a similar letter, arguing that it was unlikely that the proposed parkway would be eligible for the fiscally constrained Regional Transportation Plan based on studies showing

that the parkway would not generate sufficient revenue to pay its costs, especially in the current economy.  AR 4800.  Golden further argued that "[a]lthough DRCOG has developed its unconstrained transportation vision and goals as locally-provided additions to the federal process in its 'Metro Vision Plan,' references to transportation plans under federal law only mean fiscally constrained plans."  AR 4800.

In February 2011, DRCOG released the 2035 Metro Vision Regional Transportation Plan, which includes as Chapter 5 the Fiscally Constrained Regional Transportation Plan.  AR 23251-256.  The Metro Vision plan explains that it is "unconstrained by financial limitations" but contains a "federally required component" that "defines the specific transportation elements and services that can be provided over the next 25 years based on reasonably expected revenues."  AR 23259.  It further explains that federal funds are available but can only be allocated according to a "regional plan that reflects expected revenues."  AR 23259.  It concludes that the Metro Vision plan includes the fiscally constrained Regional Transportation Plan for "federal funding purposes."  AR 23259-260.

The Metro Vision plan identifies "regional and community" bicycle corridors "as part of a system" intended to ensure "connections among various parts of the region." AR 23327.  It explains that the "precise location of many corridor facilities is not known at this time" but that any new facilities designated according to the plan must be "within 1,000 feet of the mapped route."  AR 23327.  It contains a map depicting the "2035 Regional Bicycle Corridor System Vision."  AR 23329.  On the map, the portion of Indiana Street adjacent to Rocky Flats is labeled as a "community corridor."  *Id*.

The February 2011 fiscally constrained Regional Transportation Plan calculates

that it will cost $900 million to construct the new bicycle and pedestrian facilities outlined in the Metro Vision plan but identifies only $590 million in available revenues. AR 23377. It does not identify which bicycle and pedestrian routes will be built and which will not. *Id*.

On December 14, 2011, the FWS sent a letter to Golden explaining that the proposed bikeway does not satisfy the RFA in part because it is not included in the fiscally constrained Regional Transportation Plan. AR 16292-294; *see also* AR 15597 (EA explaining rejection of Golden's application on the same grounds).

The Court finds Golden's initial arguments persuasive. Given that the Clean Air Act requires regional transportation plans to be fiscally constrained, it would be illogical to interpret the term "regional transportation plan" in a federal statute to encompass a fiscally unconstrained plan. *See* 40 C.F.R. § 93.108 ("Transportation plans . . . must be fiscally constrained . . . in order to be found in conformity."). This interpretation is consistent with the RFA's goal of easing existing pressure on transportation facilities, which would be served by conditioning the transfer of the corridor on a showing that fiscal constraints will not preclude the proposed improvements.

However, this interpretation does not mean that the fiscally constrained Regional Transportation Plan is invalid because it does not identify specific bicycle or pedestrian projects. *See* Docket No. 100 at 60-61. The fiscally constrained Regional Transportation Plan meets the federal requirements that it "include . . . bicycle transportation facilities" and that it give "due consideration" to bicyclists by allocating $590 million to "New Bicycle/Pedestrian Facilities." 49 U.S.C. § 5303(c); 23 U.S.C. § 217(g)(2).

The FWS' reading of the phrase "regional transportation plan" to mean the federally required fiscally constrained Regional Transportation Plan is permissible, and thus it was not arbitrary and capricious to reject Golden's application on the ground that its application was not included in the fiscally constrained plan.

### C.  The National Wildlife Refuge System Administration Act

Plaintiffs argue that the FWS violated the Refuge Act by failing to issue a compatibility determination.  Docket No. 92 at 37-40; Docket No. 100 at 61-62; 16 U.S.C. § 668dd(d); 50 C.F.R. § 26.41.  Defendants contend that such an analysis is not required because the RFA supersedes the Refuge Act's compatibility determination requirement.  Docket No. 95 at 117.

The Refuge Act states that the Secretary of the Interior "shall not initiate or permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the Secretary has determined that the use is a compatible use."  16 U.S.C. § 668dd(d)(3)(A)(i).  A use is "compatible" if it will not "materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the refuge." 16 U.S.C. § 668ee(1).  The statute lists hunting, fishing, public recreation, public access, accommodation, and easements for utilities or transportation as examples of compatible uses.  16 U.S.C.  § 668dd(d)(1).  The statutory examples "encompass a common ingredient," namely, they are all "meant to be performed by third parties or the public."  *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 11 (D.D.C. 1998).

A compatibility determination must be in writing and its conclusion must be based on the Secretary's "sound professional judgment."  50 C.F.R. § 25.12; *see Ctr.*

*for Food Safety v. Salazar*, --- F. Supp. 2d ----, 2012 WL 4857793, at *19 (D.D.C. Oct. 15, 2012).  It must address a number of issues, including the nature and extent of the new use, the reason for proposing a new use, the expected impact of the new use on the individual refuge and the refuge system as a whole, the costs of administering the new use, and stipulations required to ensure compatibility.  50 C.F.R. § 26.41(a).  A compatibility determination is not required for flights over a refuge or for activities conducted by an agency other than the FWS that has primary jurisdiction over refuge land.  16 U.S.C. § 668dd(d)(4)(A)-(B).  In addition, the FWS' internal guidance states that a compatibility determination is not required where "legal mandates supersede those requiring compatibility."  *See* National Wildlife Refuge System Uses Compatibility, 603 FW 2.10(B)(1) (Nov. 17, 2000), *available at* http://www.fws.gov/policy/603fw2.html.  The FWS did not issue a compatibility determination for the land exchange.  The EA explains:

> The Service's Compatible Uses Policy (USFWS 2000b), and the National Wildlife Refuge System Improvement Act set forth general rules and provide guidelines for determining compatibility of existing and proposed uses of the Refuge.  This policy does not apply to circumstances where other legal mandates supersede those requiring compatibility.

AR 15737 (Appendix D: Process for Evaluation of Competing Applications).

 An agency interpreting its own statute receives "substantial deference" and its interpretation is granted "controlling weight" unless "plainly erroneous or inconsistent with the regulation."  *United States v. Mollner*, 643 F.3d 713, 718 (10th Cir. 2011).  Town of Superior argues that the RFA does not "supersede" the Refuge Act because it explicitly states that the corridor must be transferred "in compliance with applicable law."  Docket No. 92 at 38; *see* Rocky Flats Act, § 3174(e)(1)(D).  It further argues that

a compatibility determination would have compelled the FWS to acknowledge that it lacks the funds to properly administer an expanded Refuge, as evidenced by a 2011 DOI report noting that the Refuge has not yet opened to the public and that invasive weeds are threatening its biological diversity.  *Id*. at 38-40; AR 20805.

Plaintiffs do not explicitly identify the alleged "use" that the FWS is initiating or expanding, but imply that a compatibility determination was required for the acquisition of land.  *See* Docket No. 92 at 40 ("There is no rationale that would support increasing the size of the Refuge by 15% in the face of these realities under the Compatible Use requirements.  USFWS' decision to acquire Section 16 is not supported by the administrative record, is contrary to the agency's compatible uses policy, and is arbitrary and capricious."); Docket No. 100 at 61-62; *see also* 16 U.S.C. § 668dd(d)(3)(A)(i).  Plaintiffs do not allege that FWS is proposing to allow new uses on Section 16 and, in fact, state that the FWS has not permitted any third-party uses, criticizing the failure to open the Refuge to the public.  *See* Docket No. 92 at 39 ("Contrary to the purposes for the Refuge that were outlined in the CCP/EIS, the Refuge has never opened to the public."); Docket No. 100 at 61-62.

The plain language of the Refuge Act supports the conclusion that a compatibility determination is not required for the acquisition of land.  First, the list of example uses does not include the acquisition or sale of refuge land, but instead references only activities carried out by third parties on existing refuge land, such as hunting, fishing, or placing lines for utilities.  *See* 16 U.S.C. § 668dd(d)(1)(A)-(B).  Second, the Refuge Act's provision authorizing the FWS to enter into land exchanges

27

is separate from the provision requiring a compatibility determination.  *Compare* 16 U.S.C. § 668dd(b)(3) *with* § 668dd(d).  Moreover, § 668dd(b)(3) does not impose any requirements on the Secretary's decision to exchange land, other than the requirement that the "values of the properties so exchanged either shall be approximately equal, or if they are not approximately equal the values shall be equalized by the payment of cash to the grantor or to the Secretary."  16 U.S.C. § 668dd(b)(3).  Congress is presumed to know how to condition an agency's exercise of authority on the completion of an analysis and did not do so in this instance.

Plaintiff Town of Superior alleges that a compatibility determination is required "when proposing a significant change to existing operations (including expansion of existing uses)."  Docket No. 92 at 38.  Its reliance on the FWS' regulations to support this proposition is unfounded.  The FWS regulations, 50 C.F.R. § 26.41, echo the statutory language and do not impose the additional requirement of completing a determination for a major "change to existing operations."  *See* 50 C.F.R. § 26.41 ("The Refuge Manager will not initiate or permit a new use of a national wildlife refuge or expand, renew, or extend an existing use of a national wildlife refuge, unless the Refuge Manager has determined that the use is a compatible use.").

Plaintiffs do not cite any cases challenging a land exchange on the grounds that the FWS failed to complete a compatibility determination.  Instead, the decision to enter into a land exchange is committed to the FWS' discretion.  *See Sierra Club v. Hickel*, 467 F.2d 1048, 1050-51 (6th Cir. 1972) (holding that, because "the Secretary [of the Interior] had discretion [under the Refuge Act and the Fish and Wildlife Act] to determine whether he should enter into the agreement for the exchange of the lands,

28

his action in so doing is not reviewable by the courts.").  In addition, the District Court

for the District of Columbia has recognized that the term "use" does not encompass

the FWS' own actions on refuge land, but instead refers only to actions taken by third

parties.  *Fund for Animals*, 27 F. Supp. 2d at 11 (holding that the FWS did not need to

conduct a compatibility determination for its elk feeding program because it would be

carried out by "persons authorized to manage" the refuge).

Since the land exchange does not fall within the meaning of "use" under the

Refuge Act, the FWS was not required to conduct a compatibility determination.

### D.  National Environmental Policy Act

#### 1.  Statutory Framework

NEPA declares the federal government's policy to "use all practicable means

and measures, including financial and technical assistance . . . to create and maintain

conditions under which man and nature can exist in productive harmony."  42 U.S.C. §

4331(a).  To that end, NEPA imposes a requirement on federal entities to take a "hard

look" at any proposed action to determine what effect such action will have on the

human environment.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350

(1989).

If a proposed federal action will not have a "significant" environmental impact,

an agency may satisfy NEPA by preparing an environmental assessment ("EA"), which

is a "concise public document" that provides "sufficient evidence and analysis" for the

agency to determine whether it needs to prepare either a more in-depth environmental

impact statement ("EIS") or, instead, can issue a finding that the action in question will

have no significant impact ("FONSI").[8]  40 C.F.R. § 1508.9(a).  An EA need only

include "brief discussions" of the need for the proposal, alternatives, and

environmental impacts of both the proposed action and its alternatives.  *Id*. at

§ 1508.9(b) (internal citations omitted).

However, a full EIS must be prepared before an agency may take a "major

Federal action[] significantly affecting the quality of the human environment."  42

U.S.C. § 4332(C).  An EIS is an "action-forcing device" with two primary purposes: (1)

to ensure that the decisionmaker "will have available, and will carefully consider,

detailed information concerning significant environmental impacts," and (2) to make

information available to the public, which "may also play a role in both the

decisionmaking process and the implementation of that decision."  *Robertson*, 490

U.S. at 349.  An EIS must address the environmental impact of the proposed action;

adverse effects that cannot be avoided; mitigation measures; alternatives to the

proposed action, including a no-action alternative; direct, indirect, and cumulative

impacts of the proposed action; and any "irreversible and irretrievable commitments of

resources" entailed in implementing the proposed action.  42 U.S.C. § 4332; 40 C.F.R.

§ 1508.25.

Agencies must begin the NEPA evaluation process as early as possible to

ensure incorporation of environmental values into agency action and to avoid

downstream delays.  40 C.F.R. § 1501.2.  In addition, an EIS should be prepared as

---

[8] A FONSI is a document "briefly presenting the reasons why an action . . . will
not have a significant effect on the human environment and for which an environmental
impact statement therefore will not be prepared."  40 C.F.R. § 1508.13.

soon as possible following an agency's receipt of a proposal so that the EIS serves the decisionmaking process, instead of rationalizing it after the fact.  40 C.F.R. § 1502.5.

### 2.  Alleged NEPA Violations

Plaintiffs allege that the FWS violated NEPA by erroneously concluding that its proposed action will have no significant environmental impact and by approving JPPHA's application and entering into the land exchange without preparing an EIS. Docket No. 100 at 13-21.  Defendants assert that the FWS' analysis, embodied in the 2004 CCP/EIS and the 2011 EA, was sufficient under NEPA to support the conclusion that the land exchange will have no significant impact and thus that an EIS was not required.  Docket No. 95 at 46.

### a.  Facts Relevant to the Alleged NEPA Violations

As stated earlier, the FWS issued a CCP/EIS in 2004, pursuant to the RFA before proposals to purchase the transportation corridor had been submitted.  *See* Rocky Flats Act, § 3178.  The CCP/EIS was intended to guide management of the Refuge for the next fifteen years.  AR 3066.  It assesses four different management alternatives: (1) no development of public facilities or education programs (which the FWS selected as the no action alternative); (2) wildlife conservation in conjunction with development of limited facilities for public use (which the FWS selected as the preferred alternative); (3) ecological restoration to pre-settlement conditions; and (4) development of broad and varied opportunities for public use.[9]  AR 3066-67.  The

---

[9] NEPA requires that an EIS "present the environmental impacts of the proposal and the alternatives," including the "alternative of no action," and that the agency identify its "preferred alternative."  40 C.F.R. §§ 1502.14(d)-(e).  The FWS' definition of a no action alternative in this case is discussed below in part II.D.2.d.

CCP/EIS acknowledges the likelihood that there will be transportation improvements near the Refuge, especially in light of the FWS' statutory obligation to identify land along Indiana Street to be made available for sale.  AR 3260; see Rocky Flats Act, § 3174(e).  With respect to such improvements, the CCP/EIS analyzes the "potential indirect impacts to the Refuge, as well as recommendations that could minimize or mitigate the effects of transportation improvements," and specifically addresses water quality, noxious weeds, wildlife corridors, noise and aesthetics, and public use facilities.  AR 3260-62.

The CCP/EIS does not, however, contain a "detailed analysis of any specific type of transportation improvement along Indiana Street, such as construction of a four-lane divided highway," explaining that such an analysis is outside the scope of the document.  AR 3261.  It concludes that "[b]ased on this analysis, and the need for future coordination and consultation associated with any transportation improvement along Indiana Street, the Service finds that transfer of a corridor up to 300 feet wide would not adversely affect the management of the Refuge."  AR 3260.

In July 2009, JPPHA submitted an application to DRCOG requesting inclusion of the proposed parkway in the 2035 Regional Transportation Plan, a prerequisite for purchasing the transportation corridor.  AR 24672; Rocky Flats Act, § 3174(e)(2)(B)(ii). This application contains the most recent version of JPPHA's proposal, including traffic projections, AR 24679, 24728-30, 24782-86, and information regarding the possible route and location of new interchanges.[10]  AR 24746, 24758-60, 24744.  The

---

[10] JPPHA's application describes the proposed parkway as follows: "Jefferson Parkway crosses to the west side of Indiana Street near Walnut Creek.  Ramps will be

32

application states that the project will require private money, but as of 2009, no private funding had been secured.  AR 23666.  ("The JPPHA expects to enter into an agreement with a private entity which will develop, finance, design, build, operate, and maintain the project for a predetermined time period allowing a fair return prior to handing the asset back to the JPPHA.").

After DRCOG added the Jefferson Parkway to the Regional Transportation Plan, JPPHA formally applied to purchase the transportation corridor from the FWS. AR 5105-17.  The application contains a two-page letter stating that JPPHA meets the requirements of the Rocky Flats Act; JPPHA's Certificate of Organization; excerpts from the CCP/EIS stating that the transfer of the corridor will not significantly impact the Refuge; JPPHA Board resolutions concerning the project; a map of the proposed road from the RTP; and a Denver Post newspaper article about the proposed parkway. AR 5105-17.  The JPPHA Board resolutions list mitigation strategies identified in the CCP/EIS and state that they are "acceptable to the Authority and will be required of those designing, constructing, maintaining and operating the Jefferson Parkway."  AR 5114.  JPPHA's application to the FWS does not contain the details regarding the parkway's scope, funding, impacts, and design that JPPHA included in its application to DRCOG.

In 2011, having received applications from both Golden and JPPHA, the FWS

---

designed for the northbound exit and southbound entrance movements from Jefferson Parkway to Indiana Street in this area.  Local traffic on Indiana Street will continue to operate independent of the tollway but at a slower speed due to traffic calming.  The Jefferson Parkway alignment then parallels Indiana Street, potentially to the west along the eastern boundary of the Rocky Flats Wildlife Refuge."  AR 24744.

issued an EA to address three main questions: (1) whether the FWS should expand the Refuge boundary; (2) whether the FWS should exchange the transportation corridor for land and mineral rights either adjacent to the Refuge or located elsewhere in Colorado; and, if yes to both questions, (3) whether exchanging the transportation corridor for parts of Section 16 and mineral rights on DOE-retained land would have a significant environmental impact.  AR 15599.  To answer these questions, the EA considers four alternatives: (1) completing a direct sale of the transportation corridor without changing the Refuge boundaries (which the FWS selected as the no action alternative); (2) exchanging the transportation corridor for land adjacent to the Refuge and mineral rights (which the FWS selected as the preferred alternative); (3) exchanging the corridor for land elsewhere in Colorado; and (4) exchanging the transportation corridor for land both adjacent to the Refuge and elsewhere in Colorado. AR 15605-613.  The EA briefly discusses several alternatives that the FWS had considered but eliminated, namely, returning management authority over the corridor to DOE; retaining the corridor; disallowing transportation improvements on Indiana Street; expanding the boundary of the Refuge and selling the corridor directly; and retaining a limited interest in the transportation corridor.  AR 15613-615.  The EA explains that the FWS rejected the option of retaining the corridor because doing so would be "contrary to congressional intent."  AR at 15613.

Referring to the 2004 CCP/EIS, the EA states that the FWS has already conducted a "full NEPA review, which culminated in an EIS" that includes "an analysis of the impacts from potential transportation improvements along Indiana Street."  AR at 15601.  The EA further explains that, based upon the 2004 analysis, the FWS has

concluded that a "transfer up to the statutory 300-foot width would not adversely affect the management of the refuge, and that the analysis satisfied its NEPA requirement relating to the mandated land disposal." AR at 15601-602.  The EA relies on the CCP/EIS in concluding that the proposed land exchange will not significantly impact the Refuge.  *See, e.g.*, AR 15646 (stating that the CCP/EIS determined that highway runoff may affect aquatic vegetation but would not significantly impact Refuge management); AR 15647 (the CCP/EIS "estimated that loss of the entire 300-foot transportation corridor would remove 8.5 acres of Preble's meadow jumping mouse habitat"); AR 15648 ("CCP/EIS identified several methods of mitigating these disturbances for both construction (e.g., light positioning) and traffic (e.g., vegetation sound barriers).").  The EA states that, although improvements to the corridor are foreseeable, the "form and scope" of such improvements are not.  AR 15668.  The EA compensates for this uncertainty by basing its analysis of the cumulative impacts on the "worst-case scenario of construction of a highway for motorized vehicles accompanied by a bicycle and pedestrian path along the same route."  AR 15668.

On December 2, 2011, the FWS issued a FONSI stating that the land exchange was selected because it

> best meets the Service's mission goal to sustain fish and wildlife populations and to conserve a network of lands that provide their habitats, while meeting congressional intent to conserve open space along Colorado's Front Range, and it most directly offsets any negative effects of the loss of the transportation corridor on the Refuge.

AR 15024.  The FONSI briefly lists nine factors in support of its finding[11] and concludes

---

[11] The FONSI lists the following factors: (1) the Land Exchange will provide for the permanent protection of 617 acres in section 16; (2) it will not jeopardize any

that "expanding Rocky Flats NWR and conducting the proposed land exchange is not a major federal action that would significantly affect the quality of the human environment within the meaning of Section 102(2)(C) of NEPA."  AR 15027.

### b. Tiering the EA to the CCP/EIS

The FWS asserts that it met NEPA's requirements by conducting a two-part analysis.  First, it argues that it issued a broad, programmatic CCP/EIS in 2004 that considered the impact of transferring the transportation corridor and found that the transfer would not significantly impact the Refuge.  Docket No. 95 at 46.  Upon receiving two proposals for the corridor, the FWS issued its EA in 2011, containing an analysis focused specifically on the impacts of several proposed transactions.  AR 15596-597.  The FWS argues that the narrower EA is "tiered" to the broader CCP/EIS and that together these two documents constitute sufficient NEPA review.  Docket No. 95 at 46-8.

Under NEPA, "tiering" refers to the "coverage of general matters in broader environmental impact statements" and the subsequent preparation of narrower statements that "incorporat[e] by reference the general discussions and concentrat[e] solely on the issues specific to the statement subsequently prepared."  40 C.F.R. § 1508.28.  Agencies are "encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues

_____

threatened or endangered species; (3) it poses only minimal risks to public health and safety; (4) it will not significantly affect any unique features of the land; (5) it will not establish precedent for future action with significant effects; (6) its effects are not highly controversial; (7) it will not affect sites listed in the National Register of Historic Places or impact cultural resources; (8) it has no significant cumulative effects; (9) it complies with federal, state, and local law.  AR 15026-27.

ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20. Tiering

is appropriate when it "helps the lead agency to focus on the issues which are ripe for

decision and exclude from consideration issues already decided or not yet ripe," 40

C.F.R. § 1508.28, and is appropriate for different stages of multi-stage projects. 40

C.F.R. § 1502.20. For example, an agency may prepare a "programmatic" analysis to

"assimilate[] broad issues," followed by a "site-specific" analysis when the program

"reaches the second tier, or implementation stage of its development." *Nat'l Wildlife*

*Fed'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 888 (D.C. Cir. 1981) (internal

citation omitted). However, "[p]roposals or parts of proposals which are related to each

other closely enough to be, in effect, a single course of action shall be evaluated in a

single impact statement." 40 C.F.R. § 1502.4(a). In addition, an agency may not

"divid[e] a project into multiple 'actions,' each of which individually has an insignificant

environmental impact, but which collectively have a substantial impact." *Thomas v.*

*Peterson*, 753 F.2d 754, 758 (9th Cir. 1985) (United States Forest Service could not

separate EIS for proposed logging road from EIS for timber sales that road was

designed to facilitate).

In *Klamath-Siskiyou Wildlands Center v. Bureau of Land Management*, 387

F.3d 989, 997 (9th Cir. 2004), the court held that tiering to a previous EIS would not

cure deficiencies in four separate EAs that the Bureau of Land Management had

prepared for four separate timber sales because none of the documents in question

addressed the cumulative effects of the four sales. In contrast, the court in *San Juan*

*Citizens Alliance v. Stiles*, 654 F.3d 1038, 1053-55 (10th Cir. 2011), held that the FWS

and BLM's EIS approving the construction of numerous gas wells in the San Juan National Forest complied with NEPA, even though it did not contain detailed information about site-specific mitigation measures.  The EIS stated that further review would take place upon the receipt of specific applications.  *Id*. at 1055.  The court held that it was appropriate to delay more detailed analysis because of the "uncertainty regarding the siting of wells and ancillary facilities."  *Id*.

The FWS' tiering of the EA to the CCP/EIS in this instance accords with the requirements of NEPA.   As in *San Juan Citizens Alliance*, the initial CCP/EIS was issued before the FWS received applications for the corridor and thus in the absence of concrete information that could support a detailed study.  *See* 654 F.3d at 1053-55.  The CCP/EIS was accordingly keyed to broad goals, namely, "guid[ing] management of Refuge operations, habitat restoration and visitor services for the next 15 years." AR 3062, 3064; *see* 654 F.3d at 1053-55.  As part of its wide-ranging inquiry, the CCP/EIS considered the impact of nearby development on the Refuge and found that the mandated transfer of a 300-foot-wide transportation corridor would not have a significant environmental impact.  AR 3260.  In keeping with NEPA's goals, the FWS did not allocate resources to duplicating this analysis in its EA and instead focused on the details of the submitted proposals.  Unlike the defendants in *Klamath*, the FWS considered the indirect and cumulative impacts of likely transportation improvements in both the CCP/EIS and the EA.[12]  AR 3262-63, 15660-671.  In addition, there is no evidence that the FWS improperly segmented its analysis in order to obscure

---

[12] The FWS' analysis of indirect and cumulative impacts is addressed below in part II.C.2.e of this Order.

38

substantial effects of the land exchange.  *See Thomas v. Peterson*, 753 F.2d at 758.

Plaintiff Golden argues that reliance on the CCP/EIS was unwarranted because it contained out-of-date information.  Docket No. 93 at 27.  However, the EA sufficiently considers the relevant changed circumstances, including JPPHA's inclusion in the Regional Transportation Plan and updated application to the FWS, AR 15597; new zoning regulations, AR 15662 ("four other areas have been included in development plans proposed by others, including Candelas, an approximately 1,451-acre property to the south of the refuge"); and identification of Preble's mouse critical habitat, AR 15630 (approximately 1,108 acres on 12 miles of Rock, Walnut, and Woman creeks are designated as critical habitat (USFWS 2010)).

### c.  Reliance on the November 2011 BiOp

Plaintiffs WildEarth Guardians and Rocky Mountain Flats argue that the EA's analysis of impacts on the Preble's mouse is inadequate because it relies on the November 2011 BiOp, which was completed after the public release of the draft EA.  Docket No. 94 at 28.  They argue that the BiOp was not subject to the NEPA process and thus cannot serve as the basis for a NEPA review.  *Id*.  They also argue that the FWS conceded the first BiOp was inadequate when it issued a second BiOp in February 2012.  *Id*.

Although NEPA requires agencies to request comments from the public when preparing an EIS, 40 C.F.R. § 1503.1(4), it only requires agencies to involve the public in its preparation of an EA "to the extent practicable."  40 C.F.R. § 1501.4(b); *see also Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1279 (10th Cir. 2004)

("NEPA's public involvement requirements are not as well defined when an agency prepares only an EA and not an EIS."). Furthermore, an "action agency may consider the analysis contained in the biological opinion . . . in reaching its decision" so long as it does not "completely ignore an issue in its NEPA documents." *Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1213 (D. Mont. 2010).

Here, the EA addresses the likely impacts of the land exchange on the Preble's mouse, noting the amount of critical habitat that would be lost, assessing the quality of that habitat in relation to habitat elsewhere in the Refuge, noting that CDOT recommended including culverts in the highway design to facilitate passage, and pointing out that construction of any transportation improvements must comply with the ESA. AR 15647. The EA does not "completely ignore" the issue of the Preble's mouse, but rather "consider[s] the analysis contained in the biological opinion." *See Forest Serv. Employees*, 726 F. Supp. 2d at 1213. It complied with the statutory mandate to involve the public to the extent practicable. *See* 40 C.F.R. § 1501.4(b). Finally, the issuance of a subsequent BiOp did not obviate the analysis contained in the first BiOp as the two documents reached substantially the same conclusion that the land exchange is not likely to jeopardize the Preble's mouse or its critical habitat. AR 14494-515, 17974-977.

### d. No Action Alternative

Plaintiffs argue that the FWS violated NEPA by failing to include in the EA a true "no action" alternative, namely, retaining the transportation corridor. Docket No. 100 at

28-29.  Plaintiff Town of Superior argues that the FWS structured its analysis so as to make the outcome of the EA inevitable.[13]  Docket No. 92 at 24.  Defendants assert that the FWS considered retaining the land in the CCP/EIS and thus did not need to reconsider this alternative in the EA, especially since doing so would be contrary to congressional intent.  AR 3260-61, 15613.

Under NEPA, an EIS must include a "no action" alternative as a benchmark for comparing the impacts of the proposed action to those of maintaining the status quo. 40 C.F.R. § 1502.14(d); *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir. 2001).  An EIS must also include "reasonable alternatives not within the jurisdiction of the lead agency."  40 C.F.R. § 1502.14(c).  Guidance from the Council on Environmental Quality ("CEQ") explains that a "potential conflict with local or federal law does not necessarily render an alternative unreasonable, although such conflicts must be considered."[14]  Forty Most Asked Questions Concerning CEQ's Nat'l Envtl.

---

[13] Town of Superior also argues that the FWS impermissibly "committed to the issuance of a decision allowing the land transfer even before the LPP/EA was performed."  Docket No. 92 at 24-25.  It cites internal emails setting a date for issuing a Record of Decision.  *See* AR 6992 ("The U.S. Fish and Wildlife Service has committed to a schedule to complete this NEPA analysis and sign a Record of Decision (ROD) by December 1, 2011."); AR 7952 ("I was told to get the EA done by December 1st").  It also cites a November 29, 2011 timeline listing December 2 as the date for signing a FONSI.  AR 14916.  Evidence that the FWS set and attempted to adhere to a schedule does not demonstrate that it "irreversibly and irretrievably" committed itself to a particular outcome before completing its analysis.  *See Wyo. v. U.S. Dep't of Agriculture*, 661 F.3d 1209, 1264, 1265 (10th Cir. 2011) (evidence that the Forest Service set an "expedite schedule" for itself and internal comments expressing concern that agency appeared biased did not meet "stringent standard applicable to claims of predetermination under NEPA.").

[14] The Tenth Circuit treats this as "persuasive authority offering interpretative guidance" with respect to the meaning of NEPA and its implementing regulations. *Wyo.*, 661 F.3d at 1260 n.36.

Policy Act Regulations, 46 Fed. Reg. 18,026, 18,027 (1981).  It also states that

agencies must analyze a no action alternative "even if the agency is under a court

order or legislative command to act."  *Id*.

Courts apply a "rule of reason" in assessing both the agency's choice of

alternatives and the extent to which the agency considers each alternative.  *Custer*

*Cnty. Action Ass'n*, 256 F.3d at 1040.  Accordingly, NEPA does not require agencies to

"analyze the environmental consequences of alternatives it has in good faith rejected

as too remote, speculative, or . . . impractical or ineffective."  *All Indian Pueblo Council*

*v. United States*, 975 F.2d 1437, 1444 (10th Cir. 1992).  The consideration of

alternatives "does not take place in a vacuum," meaning that "alternatives that are not

legally permissible" might not "meet the purpose and need's criteria for detailed

consideration in the EA."  *Wyo. Snowmobile Ass'n v. U.S. Fish & Wildlife Serv.*, 741 F.

Supp. 2d 1245, 1254 (D. Wyo. 2010).  An EIS is sufficient so long as it includes

"information sufficient to permit a reasoned choice of alternatives as far as

environmental aspects are concerned."  *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162,

1174 (10th Cir. 1999).

In contrast to the detail required in an EIS, an EA need only contain "brief

discussions" of the "alternatives to the proposed action."  *Compare* 40 C.F.R.

§ 1508.9(b) *with* 42 U.S.C. § 4332(C).  "When an agency has concluded through an

Environmental Assessment that a proposed project will have a minimal environmental

effect, the range of alternatives it must consider to satisfy NEPA is diminished."  *Cent.*

*S.D. Co-op Grazing Dist. v. Sec'y of U.S. Dep't of Agric.*, 266 F.3d 889, 897 (8th Cir.

2001).  NEPA requires only that an EA "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(E).

Proving that an agency predetermined the outcome of its analysis is a high bar: courts may issue a finding of predetermination "only when an agency *irreversibly and irretrievably* commits itself to a plan of action" that depends on a particular result before completing its analysis.  *Forest Guardians*, 611 F.3d at 713 (emphasis in original) (emails showing that agency had a preferred outcome were not sufficient to show predetermination).

In *Wyoming Lodging and Restaurant Association v. United States Department of Interior*, 398 F. Supp. 2d 1197, 1216 (D. Wyo. 2005), the plaintiff association challenged a DOI rule on the use of snowmobiles in Yellowstone Park, arguing in part that the agency had violated NEPA by failing to include a no action alternative in its EA.  At the time, the DOI's rule was being litigated in several different district courts. *Id*.  Facing uncertainty in the legal landscape, DOI chose to treat several different alternatives as the potential no action alternative.  *Id*.  DOI explained that the EA could be used to compare the different alternatives to one another and to historical use levels and vehicle types.  *Id*.  The court held that DOI had not violated NEPA, stating that, if DOI had selected a single no action alternative based on a prediction as to how one of the district court cases would be resolved, it risked its prediction being wrong and having that alternative be unavailable.  *Id*. at 1217.  That would in turn open the

door to a challenge on the grounds that it lacked a no action alternative.  *Id*.

In its 2004 CCP/EIS, the FWS evaluated the alternative of retaining the corridor.  *See* AR 2607, 3260-63.  The FWS decided not to analyze this alternative further in its EA.  AR 15613.  This decision was not improper given the lesser obligation to consider alternatives in an EA as opposed to a full EIS.  *See* 40 C.F.R. § 1508.9.  The CEQ's guidance that an agency is required to consider alternatives that may be legally proscribed, *see* 46 Fed. Reg. 18,026, 18,027, strictly applies to an EIS, not an EA.  While the comparative purposes of an EIS and an EA might have suggested to the FWS that it should discuss the no action alternative of not transferring the corridor in the EA, the Court cannot find, given the discussion of that alternative in the EIS and given the fact of a congressional mandate, that the FWS' reliance on the congressional mandate alone in not considering that alternative is inappropriate.  Furthermore, since the FWS had already concluded that "transfer of a corridor up to 300 feet wide would not adversely affect the management of the Refuge," it was not obliged to conduct its analysis in a vacuum by disregarding both the legal landscape and its prior conclusions.  *See Wyo. State Snowmobile Ass'n*, 741 F. Supp. 2d at 1254.

### e.  Cumulative Impacts

Plaintiffs argue that the FWS' analysis of the cumulative impacts of the land exchange "falls short, providing only general statements devoid of specific, reasoned explanations" and thus does not constitute the requisite "hard look."  Docket No. 100 at 30.  Defendants assert that the FWS' analysis was sufficient, given the "inherent uncertainty" in the proposed project and the likelihood of future environmental analysis.

Docket No. 95 at 48-52.

Under NEPA, an EIS must discuss the direct, indirect, and cumulative effects of a proposed action.  40 C.F.R. §§ 1508.8, 1508.25.  In determining whether an effect is significant, an agency must consider its context, including the scale of the proposed action, and its intensity, meaning the severity of the impact or the degree to which it is adverse.  40 C.F.R. § 1508.27; *Envtl. Protection Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006).  Cumulative impacts are those that "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  In considering the cumulative impacts of a proposed action, agencies must offer some "quantified" or otherwise detailed information; "general statements about 'possible' effects and 'some risk' do not constitute a hard look absent a justification regarding why more definitive information could not be provided."  *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998).

However, "determination of the extent and effect of these factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies."  *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).  Moreover, "NEPA does not require that an agency discuss every impact in great detail; it simply requires a reasoned evaluation of the relevant factors."  *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1172 (10th Cir. 2007).  "In reviewing the adequacy of an EIS, we determine whether 'there is a

45

reasonable, good faith, objective presentation of the topics,' such that it 'foster[s] both informed decision-making and informed public participation.'" *Id*. at 1172 (quoting *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1035 (10th Cir.2001)).

### i.  Plutonium

Plaintiffs argue that the FWS violated NEPA by failing to "fully analyze and publicly disclose the public health impacts associated with Parkway construction, which prevented FWS from considering alternatives to and mitigation for the Land Exchange."  Docket No. 100 at 34.  In addition, plaintiffs WildEarth Guardians and Rocky Mountain Wild assert that an EIS was required because the risk of plutonium contamination is uncertain and controversial.  Docket No. 94 at 33-35.  Defendants assert that the FWS' conclusion is supported by the record and that there is no uncertainty or controversy within the meaning of NEPA.  Docket No. 95 at 62-70.

In assessing whether a proposed action will significantly impact the human environment, an agency must consider the extent to which the action is highly controversial, highly uncertain, or involves unique or unknown risks.  40 C.F.R. § 1508.27(b)(4)-(5).  A proposed action is "highly controversial" if there is a "substantial dispute [about] the size, nature, or effect of the major Federal action;" mere "opposition to a use" is not sufficient.  *Native Ecosystems Council v. United States Forest Service*, 428 F.3d 1233, 1240 (9th Cir. 2005) (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)).  An EIS is warranted "where uncertainty may be resolved by further collection of data," especially where such data may reduce the need for speculation.  *Id*. (internal citation omitted).  "[I]nformation

merely favorable to [plaintiff's] position in the NEPA documents does not necessarily raise a substantial question about the significance of the project's environmental effects." *Id*.

In *Middle Rio Grande Conservancy District v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002), the court held that the FWS' designation of Middle Rio Grande River as critical habitat for the silvery minnow was controversial because the "wide disparity in the estimates of water required for the designation, and the associated loss of farmland acreage" indicated there was a "substantial dispute as to the size, nature, or effect of the action." The evidence was such that the court held that the "record conclusively demonstrates that the effects of water reallocation and curtailment of river maintenance are significant." *Id*.

The record here does not "conclusively establish" that remaining plutonium in the transportation corridor topsoil will have a significant environmental impact, nor does it establish the existence of a substantial dispute on the matter. *See id*. at 1229. Pursuant to CERCLA, the DOE released a Remedial Investigation/Feasibility Study ("RI/FS") for Rocky Flats in June 2006 which concluded that, in the area of the transportation corridor, the "dose estimates [for plutonium for a Refuge worker] are well below the acceptable annual radiation dose of 25 [millirem] specified in the Colorado Standards for Protection Against Radiation."[15]  AR 25969 at 21; *see* 42 U.S.C. § 9604(b).  Subsequently, DOE, EPA, and CDPHE issued a joint Corrective Action

---

[15] The data relied on in the RI/FS was collected pursuant to "agency-approved Sampling and Analysis Plans" and DOE determined that the "data are adequate for the purposes" of the Comprehensive Risk Assessment.  AR 25969 at 3-4.

Decision/Record of Decision ("CAD/ROD") based on the RI/FS, in which they

concluded that the:

> . . . risk and dose from low levels of residual radionuclides in the
> Peripheral OU[16] [operable unit] were well within the EPA's acceptable risk
> range for a rural resident, and were below the activities corresponding to
> the State of Colorado's [25-millirem] dose criterion for rural residents.
> Conditions in the Peripheral OU are acceptable for unrestricted use and
> unlimited exposure.

AR 2467-468.  The CAD/ROD further explained that, even if the highest level detected

anywhere in the Peripheral OU, which was 20 picocuries/gram ("pCI/g"), were the

average for the area, the risk level would still be "in the middle of the CERCLA risk

range."[17]  AR 2452.  Furthermore, in September 2011, the FWS reached out to EPA

and CDPHE to request "an evaluation of how exposure pathways for construction

workers and future users of proposed non-motorized trails on these lands would differ

from [pathways for Refuge workers or visitors]," including "any impacts to the general

public resulting from construction of roads and/or trails in the transportation corridor."

AR 15819.  The agencies' response acknowledges that "[r]isk to a construction worker

was not directly calculated in the RI/FS Report" but explains that:

> Because the exposure pathways and assumptions are similar to those used
> for a WRW [Wildlife Refuge Worker], the risks should be somewhat similar
> to the risks calculated for a WRW.  Differences include the potential for
> greater rates of inhalation and ingestion of soil by the construction worker.

---

[16] The Central OU "consolidates all areas of the site that will require additional
remedial/corrective actions."  AR 2404.  The Peripheral OU is the land surrounding the
Central OU that does not require further remedial action.  *Id*.

[17] The CERCLA risk range is relevant to NEPA as CERCLA contains substantive
safety standards that NEPA lacks while also imposing NEPA-like procedural
requirements.  *See* 40 C.F.R. § 300.430 (a)(2).  The relationship between the two
statutes is discussed below in this section.

Those differences are likely offset by the much greater exposure duration for the WRW (18.7 years versus a few months for a construction worker). Due to the very short exposure duration, the very low levels of residual plutonium in the strip of land proposed for transfer and the calculated low radiation dose . . . the risk to a construction worker would be at or below the low end of the CERCLA risk range.

AR 15824-825. The letter concludes that "even for scenarios involving a fire in the historic 903 Pad area, emissions will be much lower than the EPA's ten millirem benchmark level for an airborne exposure pathway." *Id*. Since the calculated risk for a refuge worker falls within CERCLA's guidelines, and that calculation is based on a considerably longer exposure duration than that of a construction worker, the Court finds that it was not arbitrary and capricious for the FWS to rely on the agencies' conclusion that a construction worker's risk would also fall within an acceptable range under CERCLA.

Of particular concern to plaintiffs is the CAD/ROD's rejection of a clean-up option involving removal of the topsoil in areas where plutonium levels exceed 9.8 pCi/g (which includes some of the transportation corridor, AR 11024) because of the "risk posed to workers involved in the removal of contaminated soil (associated with the operation of heavy equipment), and the risk posed to the public from the transportation of these soils to disposal sites." AR 2468. However, this statement shows only that the benefits of removing soil in those areas did not outweigh the risks, including the risks of worker injury through use of heavy machinery and the transportation of excavated soil. *See* AR 2468. Moreover, plaintiffs' focus on this statement ignores the CAD/ROD's conclusion that the "[c]onditions in the Peripheral OU are acceptable for unrestricted use and unlimited exposure." AR 2468.

Plaintiffs WildEarth Guardians and Rocky Mountain Wild argue that the risk of plutonium dispersal is uncertain because there is a discrepancy between the maximum level that the FWS set in 2004 and the level that CDPHE and EPA used in 2011. Docket No. 94 at 34-35; AR 15822; *compare* AR 2816 (CCP/EIS statement that "DOE is anticipating retaining management responsibility for all lands with surface soils having a plutonium concentration more than approximately 7 pCi/g, in order to minimize the potential for erosion and surface water impacts") *with* AR 15822 (September 2011 letter from CDPHE and EPA stating that risk levels in the Refuge are "well below the 9.8 pCi/g that corresponds" to the bottom of the CERCLA risk range); *see also* AR 17427-430 (August 2011 FWS letter requesting clarification from EPA and CDPHE regarding discrepancies in "risk assessment and levels of remaining plutonium contamination in Refuge lands").  This evolution of the agencies' understanding of the risk associated with plutonium in the soil is not sufficient to show that there is a substantial dispute over whether construction of the proposed parkway would have a significant impact in dispersing plutonium.  The FWS' finding of no significant impact is supported by the conservative approach that the agencies took in assessing the risk of plutonium exposure on the Refuge.  *See, e.g.*, AR 2445-47 (describing the "exposure point concentration" technique).

Plaintiffs further challenge the FWS' reliance on the September 2011 letter from EPA and CDPHE on the grounds that the FWS was required to ascertain the radiation risk for itself and that the FWS cannot rely on a "non-NEPA" document to satisfy its NEPA obligations.  Docket No. 94 at 35-39.  NEPA regulations, however, not only permit but require agencies to incorporate extrinsic material into an EIS by reference if

it will "cut down on bulk without impeding agency and public review of the action."  40

C.F.R. § 1502.21.  The only restriction on doing so is that the material be available for

public review within the time frame for commenting.  *Id*.

Moreover, the FWS' reliance on DOE, EPA, and CDPHE was appropriate in this

instance, given that those agencies were required under CERCLA to conduct a

feasibility study and select a remedial action for the refuge.  42 U.S.C. § 9620(e).

CERCLA not only imposes substantive standards regulating carcinogen exposure, 40

C.F.R. § 300.430(e)(2)(i)(A)(2), it also requires agencies to follow a NEPA-like process

in conducting a feasibility study and selecting a remedial action.  40 C.F.R.

§ 300.430(a)(2) ("Developing and conducting an RI/FS generally includes the following

activities: project scoping, data collection, risk assessment, treatability studies, and

analysis of alternatives.  The scope and timing of these activities should be tailored to

the nature and complexity of the problem and the response alternatives being

considered.").  Given the expertise of the DOE, EPA, and CDPHE in managing the risk

of radionuclide exposure in the Refuge, the agencies' mandate under CERCLA to

assess exposure levels and select remedial action, and the agencies' compliance with

the CERCLA standards, the FWS' incorporation of the agencies' findings into its

analysis was not arbitrary or capricious.  *Cf. W. Neb. Res. Council v. U.S. E.P.A.*, 943

F.2d 867, 871-72 (8th Cir. 1991) ("EPA does not need to comply with the formal

requirements of NEPA in performing its environmental protection functions under

organic legislation [that] mandates specific procedures for considering the environment

that are functional equivalents of the impact statement process.") (internal citation and

quotation marks omitted).

Plaintiff WildEarth Guardians and Rocky Mountain Wild assert that there is uncertainty about the risk of plutonium contamination because the transportation corridor is "contaminated above levels set forth in Colorado Standards for Protection Against Radiation" ("CSPAR") and thus construction of a parkway threatens a violation of state law.  Docket No. 94 at 36.  This argument misconstrues state law.  Under Colorado law, special techniques must be used for construction on land where plutonium levels exceed 1 pCi/g.  6 COLO. CODE. REGS. § 1007-1:4.60 (2012); *see also Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1147 (10th Cir. 2010) (holding that § 1007-1:4.60 "says nothing about the minimum level at which such contamination becomes unreasonable.  It merely indicates special care must be taken for construction on property contaminated at the particular level indicated.").  This level was set in 1973 in order to keep radiation levels as low as reasonably achievable.  AR 15823-824.  When the FWS transfers the transportation corridor to a state or local entity, the corridor will be subject to CSPAR and the owner will work with CDPHE to "evaluate appropriate construction controls, which would likely consist of dust suppression."  AR 15824.  Dust suppression is not a restriction on use, and thus state law does not alter the agencies' finding that the corridor is appropriate for unrestricted use.  *Id*.  The FWS explicitly accounted for state regulations of construction techniques, and thus there is no threatened violation of state law.  AR 15664 ("The CDPHE has stated that construction activities would require adherence to . . . appropriate construction controls such as dust abatement, erosion control, and sediment control to mitigate environmental (including human health) impacts . . . . None of these are considered 'restrictions' on land use.").

Plaintiff WildEarth Guardians and Rocky Mountain Wild cite instances in which the FWS recognized that the issue of plutonium in the transportation corridor is "controversial" and that there is public concern regarding plutonium contamination. Docket No. 94 at 33-34; AR 12071, 17427, 7599-7600, 6552, 12987, 7528, 6606, 8111, 10890, 7691-92, 6538-40 ("Although the July 2006 Remedial Investigation/Feasibility Study states that the site meets EPA standards, citizens and organizations still express concern regarding contamination of the site").  These instances do not reflect a legal or scientific conclusion, but instead indicate the FWS' intention to "approach this slowly and with full public engagement in order to garner support."  AR 6538.  Public opposition on its own, however, does not make an issue controversial under NEPA.  *See Native Ecosystems Council*, 428 F.3d at 1240.  This evidence does not show that there is a substantial dispute regarding the effects of construction in the corridor.

In sum, the record does not support plaintiffs' assertion that the uncertainty or controversy regarding plutonium contamination in the Refuge is sufficient to render the FWS' finding on the matter arbitrary or capricious.

### ii. Induced Growth

Plaintiffs argue that, because the parkway's "main purpose" is to facilitate development in surrounding areas, such development is a "connected action" that the FWS failed to adequately consider.  Docket No. 92 at 25-27; Docket No. 93 at 32-39; Docket No. 100 at 34-38.  Defendants assert that the FWS' analysis was sufficient because the proposed parkway is a response to, and not a cause of, prior and ongoing growth in the area, which has been projected for over a decade.  Docket No. 95 at 52-

57.

Under NEPA, actions are "connected" and must be addressed in the same

NEPA analysis if they "[c]annot or will not proceed unless other actions are taken

previously or simultaneously" or are "interdependent parts of a larger action and

depend on the larger action for their justification."  40 C.F.R.  § 1508.25(a)(1).  To

determine whether actions are connected, the Tenth Circuit applies an independent

utility test that asks whether "each of the two projects would have taken place with or

without the other."  *Colo. Rail Passenger Ass'n v. Fed. Transit Admin.*, 843 F. Supp. 2d

1150, 1166 (D. Colo. 2011) (quoting *Wilderness Workshop v. U.S. Bureau of Land

Mgmt.*, 531 F.3d 1220, 1229 (10th Cir. 2008)).  NEPA recognizes that some federal

actions may have indirect "growth inducing effects," as well as related effects on the

"pattern of land use" and on "population density or growth rate," and requires agencies

to study such effects when they are reasonably foreseeable.  40 C.F.R. § 1508.8(b).

The fact that a proposed action and "surrounding private development are mutually

beneficial does not make them connected *per se*."  *Colo. Rail*, 843 F. Supp. 2d at

1166.

The court in *Colorado Rail* held that the Federal Transit Administration did not

abuse its discretion in declining to analyze future private development as action

connected to the proposed renovation of Union Station.  *Id*. at 1165.  This holding was

based in part on the fact that the proposed federal action and the private development

had independent utility: renovating the station would increase transportation options in

downtown Denver, while the private development would allow low-density areas to

absorb Denver's ever-expanding population. *Id*. at 1165-66. The court's conclusion was not altered by its recognition that "much of the private development was designed to take advantage of the increased transportation options" in the proposed action. *Id*. *See also Airport Neighbors Alliance, Inc. v. United States*, 90 F.3d 426, 430-31 (10th Cir. 1996) (the FAA's decision to upgrade an airport runway did not require an in-depth analysis of the rest of Albuquerque's twenty-year Master Plan for renovating the airport because the runway upgrade had a "justification independent from other components of the Master Plan.").

Furthermore, an agency may find that a proposed action will not have a significant impact on growth if such growth has already been planned or accounted for at the local level, even if local planning assumes the eventual completion of the proposed action and even if the proposed action will alter the rate of growth. *See Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 525-26, n.9 (9th Cir. 1994) (finding that an EIS' analysis of induced growth was not rendered arbitrary and capricious by certain "weaknesses," namely, that "the EIS's conclusions regarding the amount and pattern of growth in Orange County were based on planning documents that assume the corridor would be built."); *see also City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1162 (9th Cir. 1997) (holding that no further analysis of project's growth-inducing impact was warranted because "local officials have already planned for the future use of the land, under the assumption that [the project] would be completed.").

An agency can also consider "existing zoning, building, and view ordinances in

evaluating whether an impact is so significant as to require an EIS, since those existing ordinances are part of the factual background against which the agency evaluation is made." *Lodge Tower Condominium Ass'n v. Lodge Properties, Inc.*, 880 F. Supp. 1370, 1384 (D. Colo. 1995) (internal citation omitted) (holding that the agency's conclusion that the "environmental impact of the transferee's proposed use could be adequately addressed through local land use decisions was simply not a mistake.").

Here, the FWS considered the proposed parkway's potential to indirectly induce growth, and the cumulative impacts of such growth, including weed infestations, barriers to wildlife movement, impacts to the Preble's mouse, increased presence of domestic pets, aesthetic effects, increased noise, and increased land values.  AR 3261-63, 15662-663, 15668-669.  The FWS noted that development has put on a strain on natural resources and on the health of wildlife populations that rely on undeveloped land.  AR 15668.  After considering these factors, the FWS pointed out that it does not exercise direct control over private development.  AR 15669.  It also noted that "many of [the reasonably foreseeable] developments are already planned . . . and will occur regardless of the transfer of the 300-foot-wide strip or development of transportation improvements" and that such development "will be subject to future compliance with state and local community planning processes and with state and federal environmental laws, analysis and mitigation." *Id*.  Taking these factors into account, the FWS concluded that the parkway would not "produce cumulatively significant impacts on the environment resulting from land development and urban growth."  AR 15669-670.

The record shows that the parkway and the surrounding development would

proceed independently of one another.  *See Colo. Rail Passenger Ass'n*, 843 F. Supp. 2d at 1165-66.  The congressional mandate to transfer the transportation corridor was a response to ongoing and expected growth in the area.  Former Representative Udall explained that transportation improvements along the Refuge were needed because, "[a]s the [Denver] area's population continues to grow, pressure is being put on the existing transportation facilities just outside the [Refuge's] borders.  The communities that surround the site have been considering transportation improvements in this area for a number of years–including the potential completion of a local beltway."  147 Cong. Rec. H10069, *H10071 (daily ed. December 13, 2001) (statement of Rep. Udall).  By 2004, Vauxmont, which lies immediately south of the Refuge, had been annexed by Arvada and was planned for residential and mixed development, and Broomfield and the Town of Superior were both planning developments in the vicinity of the Refuge.  AR 3203.  By 2011, development had begun in both Vauxmont and Cimarron Park, an area northwest of Indiana Street and State Highway 72.  AR 15662.  DRCOG estimates that the population of the Denver region will increase by almost two million people by 2035.  AR 23267.  As the 2011 EA states, the "annexation process to facilitate development of most remaining available land in that region is proceeding in the absence of existing transportation improvements."  AR at 15668.

Given that the region is growing, and is expected to grow, in the absence of the proposed parkway, the fact that the parkway would be beneficial to developing communities does not render it a connected action under NEPA.  *See Wilderness Workshop*, 531 F.3d at 1229.  There is no evidence that such growth "cannot or will not proceed" unless the parkway is built or that urban development is an "interdependent"

part of the plan for the parkway.  *See* 40 C.F.R. § 1508.25(a)(1).  Nor is it the case that the parkway would not be built absent the prospect of new communities.  On the contrary, the parkway is intended to meet existing transportation needs and has been contemplated for many years.  *See* 147 Cong. Rec. H10069, *H10071 (daily ed. December 13, 2001) (statement of Rep. Udall).  As induced growth is not "connected" to the parkway, the FWS' analysis is sufficient.

Golden cites a study commissioned by the Jefferson Economic Council on the impact of the proposed parkway on projected development.  Docket No. 93 at 34; AR 24609.  The study found that development would likely occur with or without the parkway, but that the "timing, intensity, and product mix of development is likely to differ."[18]  AR 24633.  Specifically, the study found that the roadway would double the net economic and fiscal impact of development in Jefferson County over the next twenty years.  *Id*.  However, effects to the rate of growth are not necessarily sufficient to render an action connected.  *See Laguna Greenbelt*, 42 F.3d at 526, n.9.

Golden also cites a 2008 Arvada Staff Report presented to the City's planning commission, which states that "development of the [Candelas] Town Center is dependent on the location and the completion of the Northwest/Jefferson Beltway." Docket No. 93 at 35; AR 25158.  This citation, however, is not sufficient to establish that the "main purpose" of the proposed parkway is to facilitate urban development, especially in light of the evidence to the contrary.  JPPHA's application for inclusion in

---

[18] The FWS explicitly considered this information, stating in the EA that transportation improvements might "affect the density, variety, and timing" of future development, AR 15668, and that "[i]ndirectly, development of a tollway may contribute to induced growth in the region."  AR 15669.

the Denver Regional Transportation Plan lists five objectives for the proposed

parkway: meeting transportation goals for improved regional connectivity, improving

transportation safety, serving local land use and development objectives, fulfilling

multi-modal transportation objectives, and providing enhanced connectivity within the

region.  AR 23661.  Only one of the five objectives is related to land use and

development.  *Id*.  Moreover, it explains that Jefferson County, the City and County of

Broomfield, and the City of Arvada have "planned around and for this project for over

20 years.  For example, the City of Arvada has carried this circumferential highway in

their transportation plans since as early as 1965."  *Id*.  It further states that the

proposed parkway will "accommodate the compact, contiguous growth envisioned in

the regional plan."  *Id*.  Local planning authorities have already analyzed and

accounted for this growth, which lessens the FWS' obligation to engage in further

analysis.  *See Laguna Greenbelt*, 42 F.3d at 526.  In addition, the FWS properly

considered the role that state and local regulations would play in moderating the

environmental impact of potential growth.  *See Lodge Tower Condominium Ass'n*, 880

F. Supp. at 1384.

In sum, the FWS' conclusion that the proposed parkway will not have a

significant impact on growth was neither arbitrary nor capricious.

### iii.  Air Quality

Plaintiffs WildEarth Guardians and Rocky Mountain Wild challenge the FWS'

finding of no significant impact on air quality on the ground that the FWS improperly

relied on CDOT's 2008 analysis even though it used an outdated ozone standard.[19]
Docket No. 94 at 39-42.  They also argue that the FWS should have analyzed the
likely effect of the parkway on nitrogen dioxide emissions.  Docket No. 94 at 42-44.

     NEPA mandates federal and local collaboration, stating that federal agencies
"shall cooperate with State and local agencies to the fullest extent possible to reduce
duplication between NEPA and State and local requirements."  40 C.F.R. § 1506.2(b).
Accordingly, federal agencies may rely on analyses conducted by state and local
governments instead of devoting resources to replicating them.  *See, e.g.*, *Carmel-by-
the-Sea*, 123 F.3d at 1162-63 (holding that the USDOT need not conduct further
analysis of development already "accounted for and properly analyzed" in the Carmel
Valley Master Plan); *Laguna Greenbelt, Inc.*, 42 F.3d at 524 n.6 ("the absence of a
more thorough discussion in the EIS of alternatives that were discussed in and
rejected as a result of prior state studies does not violate NEPA"); *Sierra Club North
Star Chapter v. LaHood*, 693 F. Supp. 2d 958, 990 (D. Minn. 2010) (holding that an
agency's indirect effects analysis was sufficient where it "analyzed existing and future
land use, existing and future population estimates, growth management strategies
from local plans, and land use regulation and ordinances," and considered local
planning documents and meetings with local officials); *Georgia River Network v. U.S.
Army Corps of Eng'rs*, 334 F. Supp. 2d 1329, 1345 (N.D. Ga. 2003) (holding that

---

[19] The EPA issued a new ozone standard in 2008.  National Ambient Air Quality
Standards for Ozone, 73 Fed. Reg. 16,436, 16,511 (Mar. 27, 2008) (to be codified at 40
C.F.R. § 50.15).  Under the rule, the EPA was required to issue designations of non-
attainment areas by March 2010 and states were required to submit State
Implementation Plans by March 2011.  *Id.* at 16,503.  The 2008 standard is to be
implemented in 2012.  AR 15665.

agency could rely on local, state, and federal laws, including county land-use plan, in analyzing growth that might result indirectly from granting permit for new reservoir).

In addition, NEPA does not "require the government to do the impractical, if not enough information is available to permit meaningful consideration." *Envtl. Protection Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1015 (9th Cir. 2006) (internal citation omitted).  The "scope and nature of the direct, indirect, and cumulative impacts analysis is a matter committed to the sound discretion of the agency." *Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1208  (D. Mont. 2010) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 413-14 (1976)).  An agency need only consider the cumulative impacts of future actions to the extent that doing so would "further the informational purposes of NEPA" with respect to both the agency's own decisionmaking process and the public's ability to contribute to that process.  *City of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1353 (11th Cir. 2005).  In order to meaningfully assess the cumulative impacts of a future action, its details must be "sufficiently concrete for the agency to gather information useful to itself and the public." *Id*. at 1353-54.

First, the EA explicitly accounts for the change in the ozone standard.  First, it explains that the FWS consulted with regional air quality experts to determine "how effects of transportation improvements would differ from those discussed" in the 2008 CDOT Study.  AR 15665.  It also clarifies that, although the Denver-North Front Range Area was classified as a non-attainment area in 2007 under the 1997 standard, it is anticipated to be classified as "marginal" under the 2008 standard, meaning that little

change will be required from the current State Implementation Plan.  AR 15665.

Second, the EA explains that JPPHA was required to demonstrate that the proposed parkway would conform to current air quality standards and state implementation plans in order to be included in DRCOG's fiscally constrained Regional Transportation Plan.  AR 15665.  DRCOG conducted an air quality analysis of its 2035 Regional Transportation Plan consistent with EPA guidance.  AR 23266; 42 U.S.C. § 7506(c)(1) (stating that regional transportation plans will lose federal funding if they approve projects or plans that will contribute to new violations or worsen existing violations of air quality standards).  Criticism of the FWS' reliance on the Regional Transportation Plan is misplaced because, as the EA notes, inclusion in the Regional Transportation Plan means that JPPHA "must conform to air quality standards and continue to comply with future standards."  AR 15665.  It was thus appropriate for the FWS to incorporate into the EA state and regional analyses that had already considered the potential effect of the proposed parkway on air quality, instead of making these findings on its own.

With respect to nitrogen dioxide, the EA explains that, at the time of publication, new standards were still in the process of public review, making it difficult for the agency to determine how current transportation plans would comply with them.  AR 15665; *see* Secondary National Ambient Air Quality Standards for Oxides of Nitrogen and Sulfur, 76 Fed. Reg. 46,804 (Aug. 1, 2011) (to be codified at 40 C.F.R. § 50).  In addition, defendants assert that it would have been impractical for the FWS to analyze the impact of the proposed parkway on nitrogen oxide levels as it lacked detailed regarding the proposed improvements and their likely effect on traffic patterns.  Docket

No. 95 at 62.  In the absence of information that would permit "meaningful consideration" of the question, the FWS was not required to do the "impractical" by modeling the proposed parkway's compliance with evolving standards.  *See Envtl. Protection Info. Ctr.*, 451 F.3d at 1014.

The FWS' finding that the land exchange will have no significant cumulative impact on air quality was not arbitrary or capricious.

### iv.  Wildlife

Plaintiffs allege that the FWS violated NEPA by failing to adequately study the impact that the proposed parkway will have on Refuge wildlife, especially birds. Docket No. 93 at 30-32; Docket No. 100 at 39-41.  FWS counters that its analysis is sufficient given the "uncertainty about the scope and nature of any transportation improvements resulting from the Land Exchange."  Docket No. 95 at 58.

NEPA requires federal agencies to take a "hard look" at the environmental consequences of their proposed actions.  *Robertson*, 490 U.S. at 350.  The "hallmarks" of a hard look are "thorough investigation into environmental impacts and forthright acknowledgment of potential environmental harms."  *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 187 (4th Cir. 2005).  Courts apply a rule of reason standard (akin to abuse of discretion) in distinguishing between significant deficiencies in an agency's analysis and mere "flyspecks."  *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002).

Courts have analyzed agencies' "hard look" in the context of impacts on wildlife. For example, in *National Audubon Society*, the court held that the Navy violated NEPA

by failing to consider the impact that siting an aircraft landing field within five miles of a national wildlife refuge would have on the thousands of waterfowl that wintered there. 422 F.3d at 187-98.  The Navy had found that migratory waterfowl "would not be affected" by the airfield because any impacts were mitigable and would be minor.  *Id*. at 186.

The court found the Navy's conclusion "difficult to reconcile with [the Navy's] failure to conduct more detailed analysis on both the relevant species and the unique properties of the habitat surrounding" the site.  *Id*.  The analytical shortcomings in the Navy's analysis included conducting a site visit during the summer when the migratory birds were in the arctic, providing no analysis of winter site visits in its EIS, the lack of a long-term systematic study of migratory bird behavior, the lack of analysis regarding the risk of aircraft-bird collisions, and failing to credit scientific evidence that nearby bird species were particularly sensitive to aircraft noise.  *Id*. at 186-93.  Finally, it found that the Navy failed to consider the cumulative impacts of its siting decision, especially the likelihood that flight plans between facilities would result in airplanes converging directly over the part of the NWR favored by wintering birds.  *Id*. at 196.

The Tenth Circuit has also recognized the importance of considering impacts on wildlife.  In *Utahns for Better Transportation*, it held that the defendant agencies violated NEPA by failing to adequately consider the impact on wildlife of the proposed Legacy Parkway, which would require filling in 114 acres of wetland around the Great Salt Lake.  305 F.3d at 1179.  The decision-making agencies had only considered impacts that would occur within 1000 feet on either side of the road, even though the

FWS presented evidence that "roads can cause significant adverse effects to bird populations as far as 1.24 miles from roadways, especially in open terrain like that adjacent to the proposed Legacy Parkway." *Id*. The court held that this decision "ignored the primary concern of many public and private entities: impacts to the [Great Salt Lake] ecosystem and its ability to continue as a nationally and internationally significant wildlife use area, particularly for migratory birds." *Id*. at 1180. The court found that the analysis was inadequate given that several million birds use the Great Sale Lake each year. *Id*.

The court in *Edwardsen v. United States Department of Interior*, 268 F.3d 781, 789-90 (9th Cir. 2001), found that the Minerals Management Service ("MMS") had taken the requisite "hard look" at environmental impacts before it approved a private plan for offshore drilling in Alaska. The proposed plan was expected to consume approximately two acres of tundra classified as wetlands under the Clean Water Act. *Id*. at 789; *see* 33 U.S.C. § 1344. Plaintiff challenged the EIS for failing to quantify the types of wetlands destroyed to date or sufficiently detail the effect of wetlands destruction on birds and caribou. *Id*. The court, however, noted that the EIS stated that:

> The construction of existing oil field facilities in the Prudhoe Bay-Kuparuk area is estimated to have directly affected over 58 square miles (150 km3) of prime waterfowl wetland habitat, including the destruction of over 14 square miles (36.3 km2) of this habitat. Cumulative habitat losses could affect the nesting distribution or density of some species for more than one generation.

*Edwardsen*, 268 F.3d at 789-90. The court credited the EIS for observing that the pipeline "could affect nesting bird habitat" and concurred with its conclusion that,

because the new pipeline's "consumption of two acres of tundra is significantly less than the fourteen square miles of tundra that has already been lost . . . 'the cumulative amount of tundra loss as a result of [the proposed action], although measurable, would be small when compared to previously disturbed acreage.'" *Id*. at 790.  The court also found that the EIS adequately addressed the pipeline's effect on caribou movement "by noting that pipelines will be elevated" to permit their passage and that "permanent roads along pipelines will be minimized." *Id*.

In this case, the FWS discussed the potential impacts of a highway on Refuge wildlife in its 2004 CCP/EIS. AR 3262.  The CCP/EIS notes that Indiana Street currently blocks wildlife passage between the Refuge and open space lands to the east and anticipates that the construction of a high-speed road would enhance this effect.  AR 3262.  However, the CCP/EIS explains that it is not desirable for larger species, such as elk, to cross to lands further east where they might cause damage to subdivisions.  It therefore suggests that additional transportation improvements include crossings that facilitate the passage of only smaller species.  AR 3262.  The CCP/EIS explains that increased noise and artificial light can negatively affect wildlife by interfering with the ability to avoid danger, locate food, reproduce, migrate, avoid collisions, and evade predators.  AR 3262.  To reduce these impacts, it suggests "incorporating berms, sound walls, vegetation, or other noise-reducing techniques into the design of transportation improvements" as well as designing and positioning lighting so as to reduce light emission and minimize effects on wildlife.  AR 3262.

Golden submitted with its application for the corridor several articles concerning the impact of road construction on nearby wildlife, *see* AR 25303-377 ("Synthesis of

66

Noise Effects on Wildlife Populations"), AR 25378-404 ("Roads and their Major Ecological Effects"), as well as the FWS' own guidance on managing bird populations. AR 25475-567 ("Birds of Conservation Concern 2008"); AR 25568-725 ("Guidelines for Raptor Conservation in the Western United States").  In its comments on the FWS' draft EA, Golden cited studies finding that "vehicular collisions can be a significant cause of mortality for some raptor species" and that owl-vehicle collisions can increase 21-fold when speed limits rise above 50 miles per hour.  AR 16002-03.  It also argued that the FWS failed to follow its own guidance in considering the effect of the project on raptor populations.  AR 16003; *see* AR 25574-575 (guidance directing federal agencies to identify and prioritize species of concern, document the nature of the proposed action, consider cumulative effects, minimize losses, and plan and schedule short-term action so it will be least disturbing to bird populations).

In response to Golden's comments, the FWS stated, in part, that there was "little suitable habitat for bald eagles, ferruginous hawks, and burrowing owls in the area under this NEPA review" and thus "little likelihood of significant adverse effects to these species which would warrant further analysis."  AR 16004.  The FWS acknowledged that "there may be effects of transportation improvements on bird species of concern" but concluded that the direct, indirect, and cumulative impacts would not be significant.  *Id.*

The FWS' final EA considers potential impacts to wildlife.  *See* AR 15647-648, 15650-651, 15652-655.  It considers the impact that the land exchange will have on the black-tailed prairie dog and determines that because the land to be divested is minimally occupied and the Refuge contains a large expanse of available habitat, the

67

divestiture is not "potentially problematic for this species, or for other special status species such as burrowing owls and bald eagles that prey upon the prairie dog."  AR 15647.  It then states that migratory bird species, including raptors, neotropical migrants, waterfowl, and shorebirds, are unlikely to be adversely affected because the "amount of suitable habitat that would be lost is not considered significant."  AR 15648. It recognizes that additional noise and light will likely result from development, likely affecting bird populations, and that the larger the project the greater the likely effect. AR 15648.  It also cites the mitigation measures suggested in the CCP/EIS.  *Id*. The EA stresses the benefits of acquiring Section 16 and the mineral rights located to the northwest of the Refuge, especially with regard to neotropical migrant bird species, wading birds, waterfowl, deer and elk, because such acquisitions will bring under Refuge control additional "shrubby riparian corridors" and other suitable habitat far enough away from SH 93 to be "very useful."  AR 15648.  It notes that, absent the land exchange, this land would likely be lost to wildlife through development.  *Id*.

The FWS' analysis is similar to that of the MMS in *Edwardsen*.  *See* 268 F.3d 781.  Like the MMS, the FWS has acknowledged that transportation improvements, especially the associated noise and light, could negatively impact certain species, particularly birds.  *See* AR 15648.  It has also considered the scale of the proposed action, considering the impacts of losing the corridor in the context of expanding the Refuge in other directions.  *See id*.  Finally, it has noted strategies for reducing the impact of subsequent transportation improvements.  *See id*.

Moreover, this case is distinguishable from *National Audubon Society*.  Here the

FWS is not the entity planning or carrying out the proposed development.  422 F.3d at

180-81 (Navy's decision to construct a landing field).  It is also distinguishable from

*Utahns for Better Transportation* because the FWS did not use an objective variable,

like geography, to limit the scope of its review in order to avoid addressing certain

impacts, but rather focused its review on those actions that were reasonably known at

the time.  305 F.3d at 1180 ("The record repeatedly and without contradiction indicates

that the 1000-foot limit used in the FEIS does not allow for consideration of impacts on

migratory birds.").  The FWS' knowledge of and control over future transportation

improvements along Indiana Street is limited, which in turn limits its ability to conduct

the kind of in-depth analysis required of the Navy in *National Audubon Society*, 422

F.3d at 181-82 (describing the Navy's plans for the airfield and its flight projections), or

the agencies in *Utahns for Better Transportation*, 305 F.3d at 1161, both of which

involved detailed building proposals.  Although the FWS could have studied the effects

of many possible variations that the JPPHA project could take, it was not required to

do so, especially given the fact that additional environmental analyses will be required

before construction may begin.  *See* CDOT Interchange Approval Process, Policy

Directive 1601.0 at 3 (Dec. 15, 2004), *available at*

http://www.coloradodot.info/business/permits/accesspermits/references, ("Following

the Systems Level Study approval, the new interchange must . . . receive NEPA

approval and access approval by FHWA"); AR 23688-689 (CDOT resolution approving

JPPHA's System Level Study on the condition that it complete a NEPA "decision

document with meaningful public involvement consistent with the CDOT Environmental

Stewardship Guide and CDOT Nepa Manual"); AR 23715 (JPPHA's System Level Study noting that additional environmental analyses are necessary to comply with CDOT requirements as well as "potential coordination of impact details and mitigation with the USFWS for impacts to the Rocky Flats Wildlife Refuge as identified in the CCP/EIS").

In assessing the impacts on wildlife of proposed transportation improvements, ones that are still in the planning stages and subject to future FWS review, the Court finds that the FWS has met its burden of thoroughly investigating the likely impacts and forthrightly acknowledging the potential harms.  *See Nat'l Audubon Soc'y*, 422 F.3d at 187.

### v.  Additional Cumulative Effects

Plaintiffs argue that the FWS' decision to transfer the corridor to JPPHA was arbitrary and capricious because it did not sufficiently analyze increased traffic, noise, and light; the spread of noxious weeds; and the change to aesthetics that will result from the proposed parkway.  Docket No. 93 at 28-32; Docket No. 100 at 37-38. Defendants assert that the FWS' analysis of cumulative effects was sufficient given the limited information available about the proposed parkway at the time the FONSI was issued.  Docket No. 95 at 48-52.

The FWS issued a FONSI stating that "[n]o significant cumulative effects were identified through this assessment."  AR 15027.  An agency's "decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise."  *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002) (internal citation omitted).  Accordingly, courts must "consider whether

the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id*. (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks omitted).  Such an inquiry must be "searching and careful" but narrow in scope.  *Id*.

In *Utah Shared Access Alliance*, the court held that USFS had a "plausible basis" for finding that its decision to eliminate roads from portions of a national forest would not have a significant environmental impact.  288 F.3d at 1214.  In that case, plaintiff challenged USFS' decision not to issue an EIS on the grounds that the agency failed to consider certain factors, including increased impacts in the areas that would remain open to vehicles and unique geographical features of the forest.  *Id*. at 1213. The court found that USFS' EA was sufficient, explaining that it recognized that "there was a difference of opinion as to whether the road closures would ultimately result in a net increase or decrease in access" and concluded that, although certain activities would increase, there would be a net decrease in use.  *Id*. at 1214.  In addition, the court stated that the "EA contains an extensive discussion of the effects of the action" and listed the factors that USFS had considered.  *Id*.

The FWS' analysis of the impacts of the land exchange is similarly sufficient. The EA reviews the unique geographic aspects of the Refuge at length, according particular attention to the rare plant and animal species that populate the Refuge.  AR 15621-626, 15628-631.  It recognizes that there is a difference of opinion regarding likely visual impacts of the land exchange, stating that nearby residents may not find the effect positive but advocates of community development may welcome it.  AR

15667.  It considers the likely increase in noise and light, notes their potential impact on wildlife, reviews possible mitigation strategies, and concludes that, even given the most extreme scenario of a highway and a bicycle path along Indiana Street, the cumulative impacts of increased noise and light will not be significant.  AR 15668.  It considers the threat that noxious weeds pose to the Refuge, finding that expansion of the Refuge to include section 16 will likely help curb their spread.  *See* AR 15646 ("If [section 16] were disturbed [by mining,] . . . noxious weeds such as toadflax and several knapweed species would likely proliferate"), AR 15650 ("Future weed infestations would be less likely [under the preferred alternative] than under the no-action alternative, and weed encroachments could be controlled more easily.").

With respect to the land exchange's impact on traffic patterns, the EA notes that the proposed parkway had not yet been designed, but that it "may consist of multi-modal improvements and is proposed to retain space for a pedestrian and bicycle pathway."  AR 15662.  It goes on to note that the parkway has been included in Denver's Regional Transportation Plan, indicating that DRCOG has found it will ease congestion overall.  AR 15661-662.  Given the limited information available about the proposed parkway and DRCOG's relative expertise in transportation planning, it was appropriate for the FWS to rely on the parkway's inclusion in the Regional Transportation Plan in finding that changes to traffic patterns do not constitute a significant impact.  *See Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 2011 WL 7701433, at *17 (D. N.M. Aug. 3, 2011) ("there is nothing objectionable about an agency considering non-NEPA materials to ascertain whether the current state of analysis in the agency's NEPA documents adequately addresses the situation."); *see*

72

*also Marsh*, 490 U.S. at 385.

"It is true here, as it is in every case, that the agency could have discussed the relevant environmental impacts in greater detail." *Utah Shared Access Alliance*, 288 F.3d at 1213. However, the FWS' analysis satisfied the fundamental purpose of an EA, which is to "briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]," while conserving resources for actions of greater significance. *Id*. (quoting *Comm. to Preserve Boomer Lake Park v. Dept. of Transp.*, 4 F.3d 1543, 1554, n.9 (10th Cir. 1993)) (internal quotation marks omitted).

In sum, plaintiffs have not carried their burden of showing that the FWS' approval of the land exchange violated NEPA.

### E.  Endangered Species Act

Plaintiffs allege that the FWS violated the ESA by issuing a Biological Opinion ("BiOp") that erroneously finds that the land exchange is not likely to jeopardize the Preble's mouse without conducting sufficient analysis of the proposed action or the land subject to exchange. Docket No. 94 at 14-20; Docket No. 100 at 62. Specifically, they argue that the FWS incorrectly counted as a benefit its acquisition of mineral rights in adjacent DOE-retained lands, even though those mineral rights are allegedly not part of the land exchange and there is allegedly no critical habitat on the land in question. Docket No. 100 at 65-69. They further argue that the FWS violated the ESA by issuing an unlawful Incidental Take Statement that does not authorize a specific amount of take and lacks minimization measures. Docket No. 94 at 25-26; Docket No. 100 at 76-79. Finally, they argue that the FWS cannot justify the destruction of critical

habitat by expanding the scope of its analysis to include the entire Refuge.  Docket No. 100 at 72-76.

### 1. Statutory Framework

The ESA provides a means for the conservation of threatened and endangered species.  16 U.S.C. § 1531(b).  Under the ESA, the FWS must identify such species, as well as their critical habitat.  *Id*. at § 1533.  The term "critical habitat" refers to areas that contain the "physical or biological features" that are "essential to the conservation of the species" and "may require special management considerations or protection," independent of whether members of the species are currently found there.  *Id*. at § 1532(5)(A).  Federal agencies must consult with the FWS before taking any action that may affect a threatened or endangered species or its habitat.[20]  16 U.S.C. § 1536(b)(3)(A).  If the FWS concludes in its BiOp that the action is (1) not likely to jeopardize the species and (2) not likely to adversely impact its critical habitat, the action agency may proceed.[21]  16 U.S.C. § 1536(b)(4).  In addition, the FWS can issue

---

[20] Since the FWS is the action agency in this case, it conducted intra-agency consultation wherein the Refuge consulted with the FWS Colorado Field Supervisor of Ecological Services.  AR 17974.

[21] Under current regulations, an action is likely to jeopardize the continued existence of a species if it is reasonably expected, directly or indirectly, to "appreciably" reduce the likelihood of both the survival and recovery of the species.  50 C.F.R. § 402.02.  It is likely to adversely modify the critical habitat of a species if it is reasonably expected to "appreciably diminish[] the value of critical habitat for both the survival and recovery" of the species.  *Id*.  These standards have been held invalid by the Ninth Circuit and questioned by the Tenth Circuit because the conjunctive requirement (survival and recovery) "read[s] the 'recovery' goal out of the adverse modification inquiry."  *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1069 (9th Cir. 2004); *see also Ctr. for Native Ecosystems v. Cables*, 509 F.3d 1310, 1322 n.1 (10th Cir. 2007).  Here, the FWS expressly stated that it did not rely on this standard and instead relied upon the statute and the *Gifford Pinchot* decision in

an Incidental Take Statement ("ITS") exempting unintended take that results from the otherwise lawful proposed action.  50 C.F.R. § 17.3.  An ITS must specify the impact (i.e., the extent or amount) of the authorized take on the species, reasonable and prudent measures necessary to minimize the impact, and mandatory terms and conditions for implementing minimization measures.  16 U.S.C. § 1536(b)(4)(C).  If the FWS concludes that either jeopardy or adverse modification is likely to result from the proposed action, the agency may only proceed with the proposed action by applying for an exemption from the laws prohibiting take.  16 U.S.C. § 1539(a).

Although its consultation requirement applies only to federal agencies, 16 U.S.C. § 1536(a), the ESA prohibits all individuals from taking listed species.  16 U.S.C. § 1538(a).  Taking includes "habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3.  Private individuals may receive an exemption to this rule pursuant to the application procedures.  16 U.S.C. § 1539(a)(2)(B).  An application for an exemption must specify the impact likely to result from the taking, steps the applicant will take to mitigate impacts, funding available for mitigation, and alternatives that the applicant has considered along with the reasons for their rejection.  16 U.S.C. § 1539(a)(1)(A).

### 2.  *Facts Relevant to the Alleged ESA Violations*

In 1998, the FWS designated the Preble's mouse a threatened species under the ESA.  *See* Final Rule to List the Preble's Meadow Jumping Mouse as a

---

completing its analysis.  AR 17985.

Threatened Species, 63 Fed. Reg. 26,517 (May 13, 1998).  The Preble's mouse is

known to live in seven counties in Colorado and two counties in Wyoming.  *Id*.  In

2010, the FWS designated approximately 34,935 acres in Colorado as critical habitat

for the Preble's mouse.  *See* Revised Critical Habitat for the Preble's Meadow Jumping

Mouse in Colorado, 75 Fed. Reg. 78,430 (Dec. 15, 2010).  This designation includes

approximately 1,100 acres of land in Rocky Flats, consisting primarily of the riparian

corridors along Rock Creek, Woman Creek, and Walnut Creek.  *Id*. at 78,475; AR

26691.

The proposed land exchange comprises separate parts with differing effects on

the Preble's mouse and its critical habitat in Rocky Flats.  The FWS anticipates that

transferring the transportation corridor to JPPHA will result in the destruction of 12.4

acres of critical habitat, while obtaining mining leases and mineral rights on DOE-

retained land[22] that will bring over 130 acres of critical habitat under the permanent

protection of the FWS.  AR 17996.  The separate parts of the exchange were

negotiated in conjunction and are understood by the parties to constitute a single land

exchange.  *See, e.g.*, AR 15479-480 (intergovernmental agreement stating that "the

City and Boulder County agree to withdraw their opposition to the authorization and

construction of the Parkway in exchange for financial assistance and support from

Jefferson County to acquire real property interests to create a permanent wildlife

conservation area to include Section 16").

The prospect of acquiring mineral rights on DOE-retained land in Rocky Flats

---

[22] "DOE-retained land" is non-Refuge land involved in ongoing environmental
clean-up over which DOE has retained jurisdiction.

arose in early 2011 when negotiations began with Lafarge West, Inc. ("Lafarge") to purchase its sand and gravel leases in Section 16.  *See* AR 6322 (Mar. 25, 2011 email from the FWS outlining various options for structuring land exchange); AR 17752 (outline of potential "quadruple bank shot deal" in which multiple transactions, including federal acquisition of McKay mineral rights, would occur simultaneously).  The acquisition of these rights was subsequently incorporated into the developing exchange.  *See* AR 17126-127 (Apr. 28, 2011 email on land exchange explaining that "JeffCo commissioners have authorized JeffCo staff to enter into negotiations to acquire Charlie McKay's Section 9 mineral rights . . . which would free up NRD funds to be applied toward the acquisition of LaFarge's lease rights in the McKay minerals and lease rights on federally owned minerals in Sections 3 & 4"); AR 6992 (June 24, 2011 memorandum listing "key elements of the transaction," including "Jefferson County purchases the 122-acre McKay mineral estate located within the existing Refuge boundaries for $2.8 million for subsequent donation to the United States for inclusion in the Refuge" and "State and federal Natural Resource Damage Trustees approve use of existing . . . funds to purchase leases held by LaFarge for minerals located within the existing Refuge boundaries and to reclaim certain previously mined areas within the exiting Refuge boundaries.").

In 2010, the National Resource Damage Trustees[23] ("the Trustees") had issued

---

[23] The Trustees are the Colorado Attorney General, the Executive Director of CDPHE, and the Executive Director of the Department of Natural Resources or their delegates.  The Trustees are "responsible for acting on behalf of the public when Colorado's natural resources are injured or destroyed as a result of an oil spill or release of hazardous substances."  Colorado Natural Resource Damages Trustees, *available at* https://www.coloradoattorneygeneral.gov/.

a request for proposals to restore ownership of Rocky Flats natural resources to the federal government.  AR 7378.  On July 19, 2011, they approved Lafarge's proposal to sell two of its mining leases, the Spicer and McKay leases, located on Rocky Flats.  AR 7378.  This purchase was conditioned, however, on Jefferson County first acquiring a fee interest in the McKay minerals and transferring that interest to the United States.  AR 7378.  Thus, as of the summer of 2011, acquisition of the Spicer and McKay leases was dependent on a separate part of the land exchange, namely, acquisition rights to the McKay minerals.  *See also* AR 7377 ("the Trustees have conditioned the McKay lease transaction on Jefferson County's successful acquisition and transfer to the United States of the fee simple interest in the McKay minerals.").

On December 5, 2011, Boulder and Jefferson Counties and the City of Boulder submitted a proposal to the Trustees asking that the funds remaining after the purchase of the Lafarge leases be used toward the purchase of Section 16.  AR 26590, ¶ 7.  The proposal identified $4.4 million in outside funding to be used in part toward acquiring the McKay mineral rights.  *Id*. at ¶ 8.  The Trustees approved the proposal, explaining that it "includes acquisition of the mineral estate on section 9, which will facilitate completion of the Trustee Council's July 28, 2011 resolution authorizing purchase of the surrender of the Lafarge-McKay lease."  *Id*. at ¶ 9.

In late December 2011, after the FWS approved JPPHA's application, the Trustees completed negotiations with Lafarge and purchased the Spicer lease.  Docket No. 95 at 28-29, n.21.  Had the Trustees delayed this purchase past December 31, 2011, it would have been significantly more expensive to purchase the McKay lease.  AR 12732 (Oct. 10, 2011 email stating that Lafarge "offered to discount the

purchase price by 10%, as long as we purchase the Spicer lease this year" and "[i]f we are able to close on the Spicer lease by Nov. 1, it would provide helpful momentum for other aspects of the section 16 deal.").  The land subject to the Spicer lease contains approximately 130 acres of Preble's mouse critical habitat.  AR 15609-611 (Environmental Assessment), AR 17976 (2012 BiOp); Docket No. 95 at 20 ("Parcels A-1 and A-2 also contain more than 130 acres of designated critical habitat for the Preble's meadow jumping mouse").[24]

In October 2011, the FWS issued a Biological Assessment of the land exchange, which concluded that it was "likely to adversely affect" the Preble's mouse or its critical habitat.  AR 26699.  It then undertook formal intra-agency consultation, culminating in the issuance of a BiOp on November 17, 2011.  AR 14497.  The BiOp finds that the proposed land exchange would "permanently convert" 12.4 acres of Preble's mouse critical habitat into transportation facilities.  AR 14511.  It concludes that this action is not likely to jeopardize the continued existence of the Preble's mouse or adversely modify its critical habitat because: (1) the FWS does not anticipate any take as a result of the land exchange; (2) the land exchange would help preserve higher quality habitat than that which would be lost; and (3) the 12.4 acres at stake represent only 1.1% of existing critical habitat at the Refuge.  AR 14514.  The FWS did not issue an accompanying ITS as it did not determine that the land exchange would cause any take.  *Id*.  The BiOp states instead that the "project proponent will be

---

[24] Plaintiffs dispute this fact, Docket No. 100 at 56, but have not met their burden of showing, by a preponderance of this evidence, that the FWS is not acquiring mineral rights on 130 acres of critical habitat.

required to obtain incidental take coverage . . . when a project has been defined and proposed."  AR 14515.

On February 14, 2012, the FWS, recognizing that circumstances had changed, issued a second BiOp along with an ITS.[25]  AR 17975.  The opinion states that the 12.4 acres in the transportation corridor are of "lower quality" because the density of willow trees is less than in other parts of the critical habitat.  AR 17990, 17991.  It states that the development of the proposed parkway is likely to result in the take of one individual Preble's mouse and concludes that the land exchange will not jeopardize the Preble's mouse for the same reasons as the previous opinion.  AR 17991, 17996.  The February BiOp includes an ITS that does not exempt any take and instead states that the project proponent will have to obtain incidental take coverage once the project is defined.  AR 17997.  Since the BiOp does not exempt any take, it does not include measures for mitigation or mandatory terms and conditions.  *Id*.

### 3.  Adverse Modification of Critical Habitat

Plaintiffs argue that the BiOp's finding of no adverse modification to critical habitat is unsupported by the record.  Docket No. 94 at 14; Docket No. 100 at 62.  Specifically, they argue: (1) that the land acquisition does not mitigate the destruction of critical habitat because the land being acquired does not contain critical habitat; (2) that the FWS failed to sufficiently analyze the land it is acquiring, Docket No. 94 at 15-20; Docket No. 100 at 65-66; (3) because DOE has already acquired a grazing lease

---

[25] The FWS attributed its decision to issue a new opinion to the fact that it had selected a preferred alternative action, completed an EA, and was certain to acquire mineral rights in the northwest area of the Refuge.  AR 17975.

and fenced Woman Creek to protect the Preble's mouse, the FWS' acquisition of Section 16 will not provide any additional benefit to the habitat there, Docket No. 94 at 17-18; Docket No. 100 at 64; (4) the BiOp is inaccurate insofar as it states that the Refuge will gain additional critical habitat, Docket No. 94 at 18-19; Docket No. 100 at 66-68; and (5) the FWS cannot justify the destruction of habitat on the basis that the amount destroyed is comparatively small.  Docket No. 94 at 22-26; Docket No. 100 at 72-76.

### a.  Benefits of Acquired Land

First, plaintiffs argue that the acquisition of mineral rights on DOE-retained cannot be counted as a benefit in the BiOp's analysis of adverse modification because these rights are not part of the land exchange.  *See* Docket No. 100 at 65-69.

The Trustees purchased the Spicer lease in December 2011 and it is not part of the exchange subject to the escrow agreement.  *See* AR 15477-487.  Nevertheless, the lease acquisition was negotiated alongside that of Section 16 and was made contingent on another piece of the land exchange, namely, the acquisition of the McKay mineral rights.  *See, e.g.*, AR 7378, ¶ 3(b).  In addition, Jefferson and Boulder Counties helped obtain funding for the purchase of the Spicer lease in order to secure the Trustees' help in acquiring Section 16.  *See* AR 26590, ¶¶ 7-9.  Finally, the purchase date of the Spicer lease was advanced in order to lower the price for the McKay lease.  *See* AR 12732.

Several emails state that the Spicer purchase was "bifurcated" from the rest of the transaction and is no longer dependent on it.  AR 16777, 16778.  These emails are

not sufficient to overcome the plain language of the Trustees' resolutions.  For example, an email dated November 3, 2011 from a DOE employee states, "We did make clear that the Trustees had bifurcated the buyout of the two Lafarge leases and that we intended to go ahead with the Spicer lease buyout, but that the buyout of the McKay lease was contingent upon the purchase of McKay's mineral rights first."  AR 16777.  However, these emails are not sufficiently specific or authoritative regarding the terms of the land exchange to overcome the evidence that the purchase of the Spicer lease was concluded as part of the land exchange.

Second, plaintiffs argue that the purchase of these mineral rights does not protect additional Preble's mouse critical habitat because, "[a]lthough portions of the Spicer Lease include Section 3 (Parcel A-1), the acquisition did not include those acres."  Docket No. 100 at 68.  To support this allegation, plaintiffs cite the Trustees' December 2011 resolution, which indicates that it authorized funds to purchase Lafarge's lease on Sections 4 and 9 and does not mention Section 3 (which contains Parcel A-1).  AR 26590, ¶¶ 5-6.  Plaintiffs also cite the EA, which likewise only mentions Sections 4 and 9.  Docket No. 100 at 68; AR 15609.  Plaintiffs do not mention, however, that the EA lists Parcel A-1 as falling within Section 4.  *Id*.  Plaintiffs' citation is thus insufficient to show that Section 3 was excluded from the purchase of the Spicer lease, especially given the clear statements to the contrary in all of the FWS' analyses of the land exchange.  *See* AR 13208 (Biological Assessment), 15609-611 (Environmental Assessment), 14511-512 (2011 BiOp), 17976 (2012 BiOp).  The administrative record establishes that the land exchange will result in the permanent protection of an additional 130 acres of Preble's mouse critical habitat, which the BiOp

82

appropriately considered as a benefit to both the species and its habitat.

Third, plaintiffs argue that the BiOp does not sufficiently assess the properties of the DOE-retained land where it is acquiring mineral rights, in violation of the requirement that a BiOp consider "beneficial actions" as well as the "environmental baseline." Docket No. 100 at 63-65; 50 C.F.R. § 402.14(g)(8). Specifically, they assert that the FWS failed to explain how the acquisition of these rights mitigates the destruction of Preble's mouse critical habitat. Docket No. 100 at 65. They state that the "Land Exchange only involves 127 acres located on DOE-lands . . . . However, these 127 acres contain no designated Critical Habitat." Docket No. 100 at 65.

The BiOp considers the nature of the DOE-retained land, stating that it contains alluvium, which has been mined. AR 17987. It further states that this mining activity has "disturbed wildlife habitat and served as a source of weeds which have degraded habitat across the site, including that for the Preble's meadow jumping mouse." *Id*. It also explains that, although DOE has in the past released water from industrial activities into Walnut and Woman creeks, it has since closure of the site consulted on restoring the ponds to a more natural state. AR 17998. In analyzing effects on critical habitat within the action area,[26] the BiOp states that "[m]ining on adjacent lands west of the Rocky Flats NWR has resulted in an explosion of noxious and invasive weeds and subsequent degradation and loss of habitat." AR 17990. Finally, in considering

---

[26] Under the ESA, the action area of a proposed action includes "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. In this case, the FWS defined the action area to encompass the Refuge as well as open space lands to the east that contain stream corridors contiguous with those on the Refuge. AR 17977.

beneficial effects to critical habitat, the BiOp states that the DOE-retained land contains 131.5 acres of critical habitat such that extinguishing mineral leases on this land would result in a net gain of 119 acres that would be "protected from mineral extraction and development and managed as wildlife habitat into perpetuity." AR 17994. As discussed above, plaintiffs have not shown by a preponderance of the evidence that the land exchange excludes the critical habitat on DOE-retained land northwest of the Refuge. The FWS' consideration of the impacts that mining has had on the Refuge and the benefits of bringing this land under FWS management was sufficient to support its conclusion.

### b. Additional Protection

Plaintiffs argue that the land exchange will not provide additional protection for Preble's mouse critical habitat because the Woman Creek corridor within Section 16 is already protected. Docket No. 100 at 64. In addition, they state that, even if the FWS were acquiring mineral rights on land that includes critical habitat, it would not constitute a benefit because "under ESA Section 7(a)(2), . . . mining cannot 'destroy' Mouse Critical Habitat designated within Section 3." Docket No. 100 at 69.

First, the BiOp recognizes that "the Woman Creek corridor was fenced by DOE," which has allowed "regeneration of riparian vegetation." AR 17992. However, this protection is not indefinite, as it is pursuant to a thirty-year lease from the state. AR 2707. The BiOp thus explains that acquisition of this land by the FWS would provide "permanent protection" to 617 acres of land in Section 16, including 104 acres of high-quality Preble's mouse habitat. AR 17992. Second, the FWS did not consider Section 16 as an offset to the loss of critical habitat; it considered the acquisition of

Section 16 only in the context of its determination that the proposed action would not jeopardize the Preble's mouse. *Compare* AR 17992 *with* AR 17994.

Although the ESA prohibits private parties from taking listed species, non-federal entities are not subject to the consultation requirement. *See* 16 U.S.C. § 1536(a). Private parties may damage or degrade critical habitat so long as that damage does not rise to the level of "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. In contrast, federal agencies may not undertake any action that would "adversely modify" critical habitat, meaning action that "appreciably diminishes the value of critical habitat" for the survival or recovery of a listed species. 50 C.F.R. § 402.02; *Gifford Pinchot*, 378 F.3d at 1071-72. Thus, private owners of mineral leases on DOE-retained land are not subject to the full force of the ESA and may carry on activities that alter critical habitat so long as those activities do not cause take. For example, the BiOp explains that mining activity adjacent to the Refuge has already "resulted in an explosion of noxious and invasive weeds and subsequent degradation and loss of habitat." AR 17990. The BiOp is not incorrect in finding that the land exchange will afford additional protection to critical habitat, both within the current boundaries of the Refuge and on DOE-retained land.

### c. Expanding the Scope of Analysis

Plaintiffs argue that the FWS improperly expanded the scope of the analysis, excusing the destruction of critical habitat on the ground that the transportation corridor

contains only 1.1% of the critical habitat within the current boundaries of the Refuge. Docket No. 100 at 72-76.  They argue that, unless the analysis is also expanded to include threats to critical habitat across the entire Refuge, this approach can sanction the "piecemeal" destruction of critical habitat, permitting a series of incremental encroachments "without ever conducting a comprehensive analysis."  Docket No. 94 at 22.

Under the ESA, adverse modification refers to any:

> direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species.  Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical.

50 C.F.R. § 402.02.  During formal consultation, the FWS must consider "any beneficial actions taken by the Federal agency or applicant" that could mitigate impacts on critical habitat.  50 C.F.R. § 402.14(g)(8).  However, the FWS may only consider mitigation measures embodied in "specific and binding plans" evidencing a "clear, definite commitment of resources for future improvements."  *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935-36 (9th Cir. 2008).

Plaintiffs cite *Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010), which held that the FWS acted arbitrarily and capriciously by analyzing the impact that a fish hatchery would have on the bull trout over a five year period, although there was no indication that the hatchery would cease operations after that time.  The court explained that the "artificial division of a continuing operation into short terms can undermine the consulting agency's ability to determine accurately the species' likelihood of survival and recovery."  *Id*. at 522.  It further explained that by conducting

a "series of short-term analyses," the FWS could repeatedly reset the baseline,

progressively lowering the bar it has to meet. *Id*. at 523. Under this approach, a "listed

species could be gradually destroyed, so long as each step on the path to destruction

is sufficiently modest. This type of slow slide into oblivion is one of the very ills the

ESA seeks to prevent." *Id*. (internal citation omitted). The Ninth Circuit concluded that

the term of analysis had to be long enough for the FWS to "make a meaningful

determination as to whether the *ongoing* operation of the Hatchery" would reasonably

be expected to appreciably reduce the survival or recovery of the bull trout. *Id*. at 523-

24 (emphasis in original).

Plaintiffs also cite *National Wildlife Federation v. National Marine Fisheries

Service*, 524 F.3d 917 (9th Cir. 2008), which held that the National Marine Fisheries

Service impermissibly excluded from its analysis the effect that its concurrent actions,

including operating a dam and related power plant, would have on a listed salmon

species. Instead, the agency considered only the proposed action's "proportional

share of responsibility" for harm to the salmon. *Id*. at 929-30. The court stressed that

an agency may not "conduct the bulk of its jeopardy analysis in a vacuum" or take

action that, "when added to the underlying baseline conditions, would tip the species

into jeopardy." *Id*; *see also Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d

230, 255 (D.D.C. 2003) ("If FWS were allowed to apply such a limited scope of

consultation to all agency activities, any course of agency action could ultimately be

divided into multiple small actions, none of which, in and of themselves, would cause

jeopardy. . . . The ESA requires more; it 'requires that the consulting agency scrutinize

the *total scope* of agency action.'") (internal citations omitted) (emphasis in original).

These cases stand for the proposition that the FWS may not distort its analysis by dividing its own action into discrete steps or temporal segments, each of which has a minimal effect, but which, taken together, adversely modify critical habitat. Here, the FWS has not misrepresented the scope of its action. It has recognized that the construction of transportation improvements is interrelated with the land exchange and will likely result in the destruction of 12.4 acres of critical habitat. It has, however, evaluated the effect of that habitat loss within the context of the Refuge as a whole.

Under *Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011), this analytical approach is impermissible where the record shows that the loss of critical habitat or its elements is associated with increased species mortality. There, the court held that the delisting of the Yellowstone grizzly bear was arbitrary and capricious in part because the FWS failed to articulate a rational connection between data in the record and its conclusion that the decline of whitebark pine was not a threat to the grizzly. *Id*. at 1020. The data showed that whitebark pines were threatened by beetles, blister rust, and climate change, and that there was a "well-documented association" between "reduced whitebark pine seed abundance and increased grizzly mortality." *Id*. at 1025.

The court rejected the FWS' argument that, even if the projected loss of whitebark pine occurred, adequate habitat would remain in the region to support the grizzly bear's recovered population. *Id*. at 1027-28. It stated that "heavy reliance on some subset of the habitat" within or outside of the conservation area could not "mitigate the impact of widespread whitebark pine decline," especially given that the

88

"Service has defined the entire 9,210-square-mile [primary conservation area] as the area 'necessary to support the recovered grizzly population.'" *Id*. at 1028.  It concluded that, "[h]aving determined what is 'necessary,' the Service cannot reasonably rely on something less to be enough." *Id*. (internal citation omitted).  In addition, the Ninth Circuit in *Gifford Pinchot* stated that "[f]ocusing solely on a vast scale can mask multiple site-specific impacts that, when aggregated, do pose a significant risk to a species."  378 F.3d at 1075 (citing *Pac. Coast Fed. of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1035-37 (9th Cir. 2001)).

Broadening the scope of the adverse modification analysis is permissible so long as the agency gives sufficient consideration to important local effects or the "critical habitat" elements in the local environment.  *Id*.; *see also Rock Creek Alliance v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439, 442 (9th Cir. 2011) (identifying local elements such as water temperature, substrate composition, migratory corridors, channel stability, and cover).  Thus, the Ninth Circuit held that the FWS did not violate the ESA when it considered selling 20,000 acres of critical habitat for timber in the context of the 6 million acres of critical habitat under federal ownership.  *Gifford Pinchot*, 378 F.3d at 1075.  It found that the biological opinions considered important local effects, like connectivity, and that the "possibility of risk" of masking local effects was not enough to render the agency's decision arbitrary and capricious.  *Id*.; *see also Rock Creek Alliance*, 663 F.3d at 442 (holding that the FWS "did not err by conducting a large-scale analysis and by relying on the relative size of Rock Creek critical habitat to evaluate the mine's impact on the bull trout" or by concluding that all habitat

elements would remain functional, albeit at a reduced level).

Decisions analyzing the designation of critical habitat under NEPA indicate that the "scale of actions" is a "crucial factor in determining whether they would directly or indirectly alter critical habitat to the extent that the value of the critical habitat for the survival and recovery of [the listed species] would be appreciably diminished." *Wyoming State Snowmobile Ass'n v. U.S. Fish and Wildlife Serv.*, 741 F. Supp. 2d 1245, 1257 (D. Wyo. 2010); *Envtl. Protection Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1010 (9th Cir. 2006) (plaintiffs did not challenge BiOp finding no adverse modification approving permit for logging expected to remove "most, if not all, of the small amount of existing nesting habitat" within critical habitat units over area of fourteen acres).  In addition, the Tenth Circuit held in *Center for Native Ecosystems v. Cables*, 509 F.3d 1310, 1322 (10th Cir. 2007), that an action can only be said to adversely modify critical habitat if it "adversely affect[s] a species' recovery and the ultimate goal of delisting."

This case is distinguishable from *Greater Yellowstone Coalition* because the transportation improvements are not part of a widespread ongoing decline in critical habitat elements that is associated with increased Preble's mouse mortality.  *See* 665 F.3d at 1028.  In addition, the FWS is not justifying the destruction of critical habitat based solely on the existence of remaining critical habitat, as in *Greater Yellowstone Coalition*, but is instead weighing the loss of critical habitat with the added protection of an additional area of critical habitat.  *See id*.

The BiOp does not ignore local effects of the land exchange, including its

impact on habitat fragmentation and connectivity.  AR 17993-994; *see Gifford Pinchot*, 378 F.3d at 1075.  It notes that the transportation corridor is at the edge of the Refuge and thus would not break up existing habitat areas.  AR 17993.  It also notes that the transportation improvements would impede access to eastern open space lands, but explains that these lands are not favored by the Preble's mouse in any case.  *Id*.  It considers the benefits of adding Section 16 land, which contains waterways contiguous with those on the Refuge, as well as the benefits of adding land that adjoins additional open space lands to the west.  *Id*.  Thus, there is no evidence that the FWS segmented its analysis in order to obscure large-scale effects.  *See Gifford Pinchot*, 378 F.3d at 1075.

The BiOp states that the 12.4 acres of critical habitat in the transportation corridor "constitute[] only 1.1 percent of the existing designated critical habitat on the Rocky Flats NWR and only 0.04 percent of the critical habitat designation as a whole." AR 17996.  Plaintiffs are correct that, standing alone, this statement would not justify the destruction of that habitat.  The language of the statute does not support a conclusion that it is acceptable to destroy critical habitat, so long as only small amounts are impacted.  *See* 50 C.F.R. § 402.02 (adverse modification includes "modifying any of those physical or biological features that were the basis for determining the habitat to be critical.").  However, the loss here is mitigated by a gain of a significantly greater area that the FWS anticipates it will be able to beneficially manage so as to "improve the condition of the habitat by enhancing riparian habitats, and by controlling the spread and reduce [sic] the density of weeds."  AR 17996.

These mitigation measures are not vague or unenforceable future goals, but integral pieces of the proposed action.  *See Nat'l Wildlife Fed.*, 524 F.3d at 935-36.

In sum, it was not arbitrary or capricious for the FWS to find that the land exchange and interrelated development of transportation improvements will not adversely modify Preble's mouse critical habitat.

### d. Incidental Take Statement

Plaintiffs challenge the FWS' February 2012 ITS on the grounds that it lacks a take limit and mandatory minimization measures.  Docket No. 100 at 76-79.  The purpose of an ITS is two-fold: shielding the action agency from liability for unintentionally taking protected species and "provid[ing] a trigger for reinitiating consultation" under the ESA.  *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 913 (9th Cir. 2012).  The FWS is not required to issue an ITS in each instance that it completes a BiOp, and, in fact, must have "reasonable basis to conclude that a take will occur" as a result of the agency action in order to issue an ITS.  *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1243 (9th Cir. 2001).  Absent such a basis, the FWS would risk arbitrarily imposing binding conditions on otherwise lawful land-use activities.  *Id*.

While it is permissible to postpone an ITS until a project that is reasonably certain to cause take comes into focus, an agency may not skirt its obligations by exempting all take associated with a given project.  Thus, the court in *Or. Natural Res. Council v. Allen* held that the FWS violated the ESA by issuing an ITS that exempted "the take of 'all spotted owls' associated with the project."  476 F.3d 1031, 1038 (9th

Cir. 2007).  The court reasoned that the ITS was insufficient because, absent an objective take limit, it would not trigger further consultation even if the "actual number of takings of spotted owls that occurred during the project was considerably higher than anticipated."  *Id*. at 1039.  An ITS may express the take threshold in numerical terms or by means of a proxy, such as measurable ecological change, so long as there is a limit.  *Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1249.  That limit may be zero; that is, a valid ITS may exempt no take.  *See Natural Res. Defense Council, Inc. v. Evans*, 232 F. Supp. 2d 1003, 1051 (N.D. Cal. 2002).

Courts have, however, held that an ITS is not required for an agency's programmatic or planning activity that "does not contemplate actual action."  *W. Watersheds Project v. Bureau of Land Mgmt.*, 552 F. Supp. 2d 1113, 1138-39 (D. Nev. 2008); *see also Gifford Pinchot*, 378 F.3d at 1067-68.  For example, in *Western Watersheds Project*, the court held that BLM was not required to issue an ITS when it enacted a fire management amendment to its resource management plan for public land.  552 F. Supp. 2d at 1137-38.  The court explained that since "no action is taking place at this time, no 'take' is occurring."  *Id*. at 1139.  The court held it was reasonable for the agency to delay "the identification of reasonable and prudent measures and terms and conditions to minimize such take" until a specific project was authorized.  *Id*. at 1138.

Plaintiffs argue that the ITS violates the ESA "by not authorizing a limited amount of take, failing to include minimization measures or terms and conditions, and not ensuring ESA reconsultation occurs should take be exceeded" even though "take

will occur due to Parkway construction." Docket No. 100 at 79. The ITS recognizes

that the "construction of Jefferson Parkway, which is interdependent upon Refuges'

[sic] proposed land exchange, will result in the incidental take of 12.4 acres of Preble's

meadow jumping mouse habitat and in the take of no more than one individual

mouse." AR 17997. However, it goes on to explain that "because this incidental take

is not under Refuge's direct control, we do not exempt any take from the proposed

action." AR 17997. The BiOp defines the proposed action as exchanging the

transportation corridor for Section 16 and mineral rights in the northwest of Rocky

Flats. AR 17975. As in *Western Watersheds Project*, *see* 552 F. Supp. 2d at 1138-39;

AR 17975-976; the "action" under consideration here does not contemplate actual

action, except for the exchange of rights in various parcels of land. The FWS was not

incorrect in stating that it does not expect any take to result from the land exchange

itself. Since the land exchange will not cause any take, the FWS was not required to

put in place measures to minimize that nonexistent take. As explained in *Arizona*

*Cattle Growers' Association*, "it would be unreasonable for the Fish and Wildlife

Service to impose conditions on otherwise lawful land use if a take were not

reasonably certain to occur as a result of that activity." 273 F.3d at 1243.

      The absence of an authorized amount of take does not mean that the parties to

the land exchange are authorized to take an indefinite number of Preble's mice. The

FWS did not issue a statement like that in *Oregon Natural Resources Council*, stating

that all take associated with the land exchange was permissible. *See* 476 F.3d at

1038-39. Instead, it explicitly authorized no take, meaning that JPPHA will have to

apply for an exemption from the prohibition on take. AR 17997 ("If future development

of the 300-foot strip of land currently in federal ownership to be divested would result in take, the project proponent will be required to obtain incidental take coverage . . . when a project has been defined and proposed."); *see* 50 C.F.R. § 17.40(I)(2)-(3) (stating that "no person" may take Preble's mice unless it is pursuant to a permit, a rodent control effort, established agricultural activity, maintenance of existing landscaping, existing uses of water, noxious weed control, or ditch maintenance).

In sum, the FWS did not act arbitrarily or capriciously, or otherwise violate the ESA, in issuing a BiOp and ITS finding that the land exchange is not likely to jeopardize the Preble's mouse or adversely modify mouse critical habitat.

## III. CONCLUSION

The Court finds that the Fish and Wildlife Service complied with the APA, NEPA, RFA, ESA, and the Refuge Act in approving the Jefferson Parkway Public Highway Authority's proposal and upholds the December 2, 2011 Decision Notice and FONSI.

Therefore, it is

**ORDERED** that the Decision Notice and finding of No Significant Impact, Rocky Flats NWR Boundary Expansion and Land Exchange, issued December 2, 2011, is affirmed.  It is further

**ORDERED** that this matter is dismissed.


DATED December 21, 2012.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge